·**John K. McNALLY, Jr., Appellee,**

v.

**NATIONWIDE INSURANCE COMPANY, Appellant.**

No. 86–5128.

United States Court of Appeals, Third Circuit.

Argued Aug. 20, 1986.

Decided March 20, 1987.

As Amended on Denial of Rehearing and Rehearing In Banc April 23, 1987.

---

Richard E. Poole (argued), Gregory A. Inskip, David J. Baldwin, Richard L. Horwitz, Potter, Anderson & Corroon, Wilmington, Del., for appellant.

F. Alton Tybout (argued), Tybout, Redfearn, Casarino & Pell, Wilmington, Del., Jeffrey M. Stopford, Media, Pa., for appellee.

Before BECKER and MANSMANN, Circuit Judges, and TEITELBAUM, District Judge.[*]

* Honorable Hubert I. Teitelbaum, United States District Judge for the Western District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal arises out of a lawsuit by John K. McNally, Jr., against his insurer, Nationwide Insurance Company. McNally contends that Nationwide failed in bad faith to settle a claim brought against him by Richard L. and Sheila M. Eckman for catastrophic injuries caused to Sgt. Eckman by McNally's negligence. Jurisdiction was founded upon diversity of citizenship, 28 U.S.C. § 1332. A jury in the district court for the District of Delaware found that Nationwide acted unreasonably in refusing either to accept the settlement offer the Eckmans made to Nationwide or to interplead its policy. Nationwide appeals, raising a wide variety of issues. We affirm in all respects.

### I. *Facts and Procedural History*

On November 9, 1980, McNally, who was driving while intoxicated, ran a stop sign in New Castle County, Delaware, and proceeded into an intersection travelling approximately 12 miles per hour above the speed limit. There he collided with an airport limousine driven by Paul J. McKelvey, an employee of the limousine's owner, Henry R. Kesterson, who was insured by CNA Insurance. McKelvey was driving approximately 10 miles per hour above the speed limit. Sgt. Eckman, a passenger in the limousine, was very seriously and perma-

nently injured;[1] his wife, also a passenger, suffered relatively minor injuries. A number of other people were injured in other ways, some very seriously, some less so.[2]

To make whole the victims of this accident McNally has essentially no assets other than his insurance policy with defendant Nationwide, which provided a total of $300,000 coverage, with a $100,000 limit on recovery for any single victim. The record does not reflect whether or not Kesterson is similarly without assets, though we do know of his policy with CNA, which provides a total of $500,000 coverage, with a $100,000 per person limit. Because McNally does not have enough assets to compensate the Eckmans for the injuries he has caused them—and the same appears to be the case for Kesterson, although the record is not clear on this point—it appears that any recovery by the Eckmans in excess of $400,000 ($100,000 from each insurance company for Mr. and Mrs. Eckman respectively)[3] could actually be collected only if the money came ultimately from the insurance companies, which of course have deep enough pockets to satisfy any judgment that might be awarded as a result of this accident.

The litigation strategy leading to this appeal is as follows. On September 18, 1981, nine months after the accident, the Eckmans' lawyer, F. Alton Tybout, wrote

---

1. Eckman's injuries have left him a paraplegic below the waist. He is permanently confined to a wheelchair, and has lost all control of bowel and urinary functions. Further, his lower body has continued to deteriorate, and he faces constant pain and discomfort for the rest of his life. See *McNally v. Eckman*, 466 A.2d 363, 366 (Del. 1983).

2. Aside from the Eckmans, the accident claimed a total of thirteen other victims. Buddy Arbuckle, Jr. suffered a broken shoulder, cuts on both legs, and bruises on his lower back and chest; he was out of work for three weeks. Arbuckle's wife, Carole, was also injured, as were Claude and Jean Beaver; the record does not show the extent of their injuries. Joseph Gittens' hip was bruised in the accident. Bernard Imren was hospitalized for chest and back pain shortly after the accident, and released. Robert Hayden was hospitalized for several months with multiple fractures. Mildred Pekelsma, aged 68, received a compound leg fracture; her husband,

Lloyd, aged 70, was hospitalized for 16 days for a compression back fracture, crushed vertebrae, damaged teeth, and cuts and bruises. Flavio Alonzo, aged 36, suffered injuries which it was feared for many months would result in serious brain damage; from the record, it appears that he has since recovered. Alonzo's wife was also hurt in the accident. Paul McKelvey, the driver of the limousine McNally struck, was killed, as was Roger Brown, another passenger in the limousine. Nationwide Authorization Request, Nov. 9, 1980, Record at 170E–207E.

3. The figure of $400,000 is simply a theoretical maximum. In practice, because her injuries were relatively insignificant compared with those sustained by the other passengers, it is inconceivable that Mrs. Eckman would receive $100,000 from either insurer. In fact, although Nationwide did interplead the policy limits on April 12, 1982, no payments have been made to Mrs. Eckman. Sgt. Eckman received a total of $200,000.

to Nationwide and CNA, offering to settle the Eckmans' claims if the insurers would each pay the Eckmans $100,000 by October 30, 1981.[4] Morton Kimmel, counsel to Nationwide in this matter, believed that Sgt. Eckman's injuries were catastrophic and could result in a huge verdict against McNally. When he received Tybout's demand letter Kimmel sent the Nationwide supervisors a memo urging them either to accept this offer or to interplead the amount of its policy with McNally into court, so that the court could then divide the funds among McNally's victims. 124E–125E. Although the matter was discussed at a conference at Nationwide's regional office, Nationwide declined to do either, and allowed the deadline on the Eckmans' settlement offer to pass.

After the settlement offer was declined the Eckmans sued McNally and Kesterson in Delaware Superior Court, where a jury awarded them a total of $3.15 million. The jury also decided that McNally was 65% responsible, and Kesterson 35% responsible, for the Eckmans' injuries. *See McNally v. Eckman*, 466 A.2d 363, 366 (Del.Sup.1983). The Eckmans then agreed with defendants McNally and Kesterson that, if the defendants would sue their insurers for bad faith refusal to settle, and would turn over to the Eckmans any money won in such suits, the Eckmans would not proceed against McNally or Kesterson. This case is the bad faith failure to settle action which McNally, pursuant to that agreement, brought against his insurer, Nationwide.[5]

Tybout has represented McNally throughout this litigation except at trial.[6]

His theory of the case has been that Nationwide was attempting to save money by settling below the policy limits, and even if that was impossible, by delaying settlement so as to keep the amount of its policy with McNally in its own coffers for as long as it could. Tybout submits that Nationwide's course of conduct was irresponsible because, when aggregated, the injuries were worth vastly more than McNally policy's limits ($300,000). It was to achieve these ends, Tybout hoped to persuade the jury, that Nationwide rejected the Eckmans' settlement offer and refused to interplead the McNally's policy limits in October, 1981.

At trial, both parties called expert witnesses to give their opinion on whether Nationwide acted unreasonably or in bad faith by failing to settle or interplead by the October 31, 1981 deadline. McNally's expert, John E. Sandbower, III, testified that Nationwide could respond reasonably to the October 31, 1981, settlement offer only by either accepting the offer or by interpleading at that time. 1605A–1612A. Nationwide's expert, Edmund N. Carpenter, II, opined that "Nationwide and its attorneys did not act in bad faith or negligently or fail to perform their duty to McNally in deferring and thus rejecting acceptance of the settlement proposal of the Eckmans, ... [or] in deferring the filing of the interpleader action." Opinion of Edmund N. Carpenter, II, at 844E.

Following a four week trial, and pursuant to special interrogatories,[7] the jury found that Nationwide acted unreasonably by failing either to interplead or accept the Eckmans' settlement offer. The jury found that this failure was the proximate

---

4. The insurers were initially told that the settlement offer would expire on October 16, 1981. Nationwide subsequently asked for and received an extension of this deadline until October 30, 1981. At trial the parties disagreed as to whether this extension also applied to CNA. As discussed in more detail below, the jury's decision on Nationwide's liability rests in part on the conclusion that CNA was in fact prepared to accept this settlement offer, and that the offer's acceptance was precluded only by Nationwide's rejection of the offer. We take this as a jury finding that the deadline was extended for CNA as well.

5. Kesterson has brought a similar suit against CNA, which is now making its way through the Delaware state courts. *Kesterson v. American Casualty Co.*, C.A. No. 83C–DE–93 (Del.Super. Ct., filed Dec. 22, 1983).

6. Tybout was called as a witness during the trial, and therefore did not serve as trial counsel. He did, however, sit at counsel table throughout the trial, and acted as an advocate outside the jury's hearing.

7. The relevant parts of the special interrogatories are set out below at note 8.

cause of McNally's current indebtedness to the Eckmans. The parties have stipulated that the damages in this case are equal to the judgment awarded against McNally in the state court action ($3.15 million), plus any interest accrued thereon since the day of entry of judgment in that action.

## II. *The Law of Bad Faith Refusal to Settle And Nationwide's Contentions on this Appeal*

█ The parties agree that Delaware law applies to this case. That law provides that, in a lawsuit between the insured and the alleged victim of plaintiff's conduct, the

liability of an insurance carrier to its policyholder in excess of policy limits is based on the tortious conduct of the insurance carrier, which under the policy has sole control of the defense.

*Stilwell v. Parsons*, 145 A.2d 397, 402 (Del. 1958). The insurer is liable if it "fail[ed] to use good faith or due care in settlement negotiations with plaintiff prior to trial." *Id.* When a judgment in excess of the policy limits might be obtained by the claimant, the good faith standard is satisfied only if the insurer acts in the same way as would a "reasonable and prudent man with the obligation to pay all of the recoverable damages." 7C John Allen Appleman, *Insurance Law and Practice* § 4711 at 395 (Berdal ed. 1979). The reasonable insurer standard must be applied on the basis of what such a hypothetical actor would do "in the light of the insurer's expertise in the field." *Id.* at 396. After instructing the jury on this law, the district court ordered the jury to give its decision by responding to three special interrogatories. The first of these is relevant for present purposes, and is set out in the margin.[8]

Nationwide challenges the finding of liability on several grounds. First, in a variety of ways Nationwide argues that the Eckmans' settlement offer was not a firm and unconditional offer to settle their case and therefore that, as a matter of law, Nationwide's rejection of that offer cannot

---

**8.** The first special interrogatory reads as follows:

> INSTRUCTION: If you answer Question 1(a) with a "No," you need not answer question 1(b).
> 1. Has McNally proved by a preponderance of the evidence:
> (a) that Nationwide breached its duty of reasonable care (as explained in the Court's instructions) by neither accepting the Eckmans' settlement offer nor interpleading on or before October 30, 1981?
> Yes __ No __
> [checked yes]
> and (b) that if Nationwide had followed one of these courses the Eckmans' judgment against McNally would not have been entered?
> Yes __ No __
> [checked yes]

The second interrogatory presented an alternative theory of liability to the jury. If, even given the information it had on October 31, 1981, Nationwide acted reasonably in failing to settle or interplead, interrogatory #2 asked the jury whether Nationwide nevertheless breached its duty to McNally by obtaining too little information about the claim, so that the insurer was still responsible for failing to resolve the Eckman claim by the settlement offer's deadline. The jury concluded that Nationwide had so breached its duty. In its answers to interrogatories #1 and #2, the jury thus determined that in light of the information Nationwide had (interrogatory

#1) and would have had if it had investigated properly (interrogatory #2), a reasonable insurer would have either settled or interpled in response to the Eckman offer. Whether or not McNally is correct that interrogatory #2 can constitute a separate ground for affirmance independent of interrogatory #1, we are compelled to address the contention Nationwide advances in this Court, that a duty to settle or interplead could never be imposed upon an insurer which knew what Nationwide knew in this case.

Nationwide has offered a convincing argument that, by the arguments he made in the district court, McNally waived reliance on the jury's decision in interrogatory #2. McNally denies having waived the argument. In view of the preceding comments we need not resolve the waiver issue.

The third interrogatory asked the jury to determine whether McNally had consumed the illegal drug psilocybin prior to the accident, and failed to inform Nationwide of this fact. (Nationwide had argued that McNally had both consumed the drug and intentionally failed to disclose the fact, and that this constituted a failure on McNally's part to cooperate with his insurer; such a failure, Nationwide further argued, would be a complete defense to the breach of duty with which McNally had charged Nationwide.) The jury found that McNally had not consumed the drug. Nationwide does not make any sustained or credible attack on this decision by the jury.

be the basis of a bad faith failure to settle claim. Second, Nationwide argues that the jury verdict was based upon an improper theory of a duty to interplead. Third, Nationwide contends that, because the offer required action by both Nationwide and CNA, and because CNA did not accept the offer, Nationwide's failure to accept it cannot be the proximate cause of the offer's rejection. Fourth, Nationwide argues that McNally consented to Nationwide's rejection of the Eckmans' offer at the time of the rejection, or ratified that decision afterwards, so that he cannot now challenge the rejection as unreasonable. If we accepted any of these arguments, we would have to reverse. Nationwide also asserts a variety of errors, relating largely to the jury instructions, which it claims require a new trial. For the reasons that follow we reject all of these contentions.

Finally, there is an issue as to the appropriate rate of post-judgment interest at which to calculate the damages McNally incurred as the defendant in the Delaware state lawsuit. The district court, applying Del.Code 6 § 2301 (1980), utilized a fixed rate of interest of 17% instead of one which fluctuated from the date of judgment to the date of payment. Although the point is a close one, we conclude that the district court was correct on this point as well. Therefore, as we have stated, we will affirm the district court's judgment in all respects.

### III. *The Conditional Nature of the Settlement Offer*

As McNally recognizes, the Eckmans would have been bound to a $200,000 set-tlement had the September, 1981 settlement offer been accepted by both Nationwide and CNA. But both McNally and Tybout acknowledge that Tybout hoped the offer would be refused, so that the groundwork would thereby be laid for a bad faith failure to settle claim against the insurers. Because of the importance of the wording of the settlement offer, we set out the relevant portion in full:

> You both have in your possession all of the information necessary to resolve the liability and damage aspects of Sgt. Eckman's claim. Its value is clearly far in excess of the combined applicable insurance coverages of $200,000. I am authorized by Sgt. and Mrs. Eckman to offer to settle the claim against both defendants provided the insurers for each defendant offer the maximum coverage available under their policies, $100,000 in each case. This offer will remain in effect until October 16, 1981. It will terminate on that date.

(123E). The nub of this case lies in McNally's contention that Nationwide acted unreasonably in not accepting this offer.[9]

McNally also contends that Nationwide acted unreasonably in not interpleading (paying its policy into court) before the deadline passed for the offer's acceptance, or at least that Nationwide would have been deemed to have acted reasonably, and prevented the Eckmans from obtaining a bad faith judgment against him, had Nationwide interpled.

Nationwide rejoins that, as a matter of law, rejection of the Eckmans' settlement

---

**9.** It is noteworthy that although Nationwide was unhappy about the time constraint imposed by the offer, it has not invited us to reverse on the ground that it cannot be held liable because the settlement offer was conditioned on an arbitrarily early deadline. In any event, however, the seriousness of Sgt. Eckman's injuries were known by the time of the offer, so that that argument would have little force. Of greater force is the contention, advanced in Nationwide's opening brief, that the deadline was too soon for Nationwide to evaluate the magnitude of the other injuries for which it might be liable under its coverage. In this regard Nationwide emphasizes the possibility, in September of 1981, that Alonzo's injuries would rival Eck-man's in severity. See above note 2. Nationwide contends that uncertainty about these injuries prevented it from determining how much of its policy to apportion to Eckman. Like many of Nationwide's contentions on this appeal, however, this is in essence an argument about the facts. The reasonableness of the deadline set in the September, 1981 letter was submitted to the jury, and the jury has found it to be reasonable. We are far from being prepared to hold that Nationwide's argument on this issue is so clearly correct that, as a matter of law, the district court should have held for Nationwide on the issue and granted summary judgment or a directed verdict on that ground.

offer cannot constitute a bad faith failure to settle the Eckman's claim. This follows, Nationwide argues, because even if it had accepted the offer, and tendered $100,000, it could not have been certain that it would thereby have obtained a release from liability, either for itself or its insured, because it was not clear that CNA would also have tendered. Nationwide emphasizes in this regard that the Eckmans' offer required action by both Nationwide and CNA: if either company refused the offer then the other could not accept it. Called to testify at the trial in the district court, Tybout explained as follows:

> Question: If Nationwide came to you on October 30th and you had not heard anything from CNA and said, Mr. Tybout, here is our $100,000, you would have responded and said No, this is a joint demand, it requires acceptance by both companies, is that correct?
>
> Answer: If Nationwide offered up to October 30th and CNA did not, that's correct, it would not be acceptable.

(1923A–25A).

■ We do not believe that the rule against conditional offers bars the condition present in this case. Specifically, an offer is impermissibly conditional only if it requires payment without providing in return a guarantee that payment will result in full settlement of the claim on which the payment is made. For example, in *Coe v. State Farm Mut. Auto. Ins. Co.*, 66 Cal. App.3d 981, 136 Cal.Rptr. 331 (1977), one of the cases Nationwide relies upon, the estate of the victim of the insured's negligent driving offered to settle with the driver's insurance company for an amount within the driver's policy limit. The State Compensation Insurance Fund, however, which had paid unemployment compensation to the victim, was not a party to this offer, and under the offer's terms the Fund remained able to sue the insurance company for the payments the Fund had made as a result of the accident caused by the insured. The offer was therefore deemed

conditional, because even if it had been accepted, and a payment made by the insurance company to the victim's estate, the insurance company could not have been certain that all liability arising from the accident would be eliminated. Id. 136 Cal. Rptr. at 338. The *Coe* court invoked the rule that a claim of bad faith refusal to settle could not be based on the insurance company's refusal to accept an offer, when such acceptance would not eliminate liability for the injuries.

■ The offer made in this case is not conditional in the way the offer in *Coe* was, because here no third claimant or subrogee was waiting in the wings who might also seek damages from Nationwide for the Eckmans' injuries. Here the conditional nature of the offer depended solely on the fact that it was not clear whether CNA would also accept. Yet this difficulty could have been obviated by Nationwide acting on its own: Nationwide could have agreed to accept its part of the offer, waited to see whether CNA accepted its part, and paid only if a full release would be obtained in return.[10] The dangers of a conditional offer, namely that a payment could be made without an assurance of ending the claim for which payment was being made, are therefore not present here. We believe that, were it presented with the question, the Delaware Supreme Court would hold that the offer made here is not impermissibly conditional simply because it required a response from more than one insurer.

In support of its contention that rejection of such an offer cannot constitute bad faith failure to settle, because an offer to settle must be "unconditional," Nationwide cites *Baton v. Transamerica Ins. Co.*, 584 F.2d 907 (9th Cir.1978). In *Baton* the Ninth Circuit predicting Oregon law, refused to find bad faith in rejection of a bilateral offer similar to the one made here. The court stated that those making the offer "would not have been bound to accept" a unilateral tender of the amount demanded

---

10. As discussed in more detail below, at 264, we believe the jury made an implicit finding that CNA was in fact prepared to accept the Eckman settlement offer. This finding gives Nationwide's argument about the conditional nature of the offer a somewhat academic quality.

from any one of the companies to which the offer was made. Id., 584 F.2d at 913.

We find *Baton* distinguishable for two reasons. First, we do not read the holding in *Baton* as being motivated by the Ninth Circuit's concern with the "conditional" nature of the offer made there. It is true that the *Baton* court justified its holding on the ground, inter alia, that, because the offer was made jointly to two insurance companies, "[t]he Batons would not have been bound to accept Cavalier's $10,000 if Cavalier had offered the $10,000 in response to [the demand] letter." Id. But there were several significant ambiguities in the *Baton* demand letter other than the condition that two insurance companies respond to it together, the most important of these relating to the extent to which the plaintiffs actually intended to make an offer capable of being accepted. These ambiguities were discussed in detail by the Ninth Circuit, and we consider them the driving force behind the decision.

### IV. *Nationwide's Duty to Interplead*

■ McNally argues that, upon being presented with the Eckmans' settlement demand, Nationwide had two choices: it could either accept the Eckman offer, or it could interplead, depositing the full amount of the McNally policy into court and allowing the court to decide how to divide the funds among the victims of the accident. Nationwide recharacterizes this contention as an attempt to impose upon it a legal duty to interplead whenever one of the claimants would be induced by the interpleader not to seek additional damages from the insured. Nationwide then attacks this recharacterization by arguing that interpleader (without release) cannot be the basis of a bad faith action because it does not discharge the liability of the insured and that claimants other than the Eckmans might have continued to pursue McNally even after the interpleader. Nationwide also points to authorities which it claims demonstrate that, in any event, interpleader is a privilege of the insurer rather than a right of the insured, and thus cannot give rise to liability.

We reject Nationwide's argument because we believe that its recharacterization of McNally's contention is improper, and because, when faithfully articulated, McNally's argument states the law properly. McNally does not argue that an insurer always has a duty to interplead whenever one claimant will be induced thereby to settle his claim. Rather, McNally argues that, given the facts of this case, if Nationwide had interpled, the Eckmans would have accepted their share of the interpleader funds and would not have sought any additional funds from McNally, and further, that the other claimants also would not have litigated to judgment against McNally.

As a factual matter there is no reason why this may not have been the case. There is evidence that it was the case from the testimony of Clyde Merrell, Nationwide's regional claims attorney, who testified that in the four years since he had taken his post, in all cases he had seen in which the multiple claims exceeded total coverage, both the insured and Nationwide had obtained releases when Nationwide put up its total coverage for the claimants to divide. 933A–37A. Certainly there is no legal reason why, if it was in fact the case, the jury should not have been permitted to decide accordingly about what course of action was or was not in McNally's best interest, or what the cause was of the $3.15 million judgment now hanging over McNally's head.

Significantly, Nationwide did not argue to the jury that the Eckmans would not have abandoned their claim if Nationwide had interpled. Rather, Nationwide invited the jury to find that, had it interpled, *other* victims of the McNally/Kesterson accident would have proceeded to judgment against McNally. McNally's lawyer, Tybout, responded to this argument by explaining that claimants would not be likely to seek a judgment against McNally which the insurer would not be obliged to pay, because McNally was essentially judgment proof:

> [A]n interpleader may not resolve a case, claimants such as the Eckmans can continue to proceed even though an interpleader has been filed. Why then does

an interpleader resolve case? It has something to do with the fact that claimants and their attorneys usually don't like to go after an empty barrel. There is very little reason to spend the time and effort and anxiety of going through a lengthy trial if when you get to the end of the trial you have a judgment and the judgment is not collectible. 27A–28A. Its verdict reflects that the jury has agreed with McNally on this factual question. We see no reason to disturb that decision.

Nationwide argues that, because this reasoning rests on a judgment about McNally's solvency, it requires the insurer to determine its strategy on the basis of, among other things, the wealth of its insured. This, Nationwide argues, flies in the face of the rule that insurers may not consider the financial status of the insured when approaching settlement negotiations. As support for this proposition Nationwide relies on D. Wall, *Litigation and Prevention of Insurer Bad Faith* § 3.16 at 45 (1985); *Maguire v. Allstate Ins. Co.*, 341 F.Supp. 866 (D.Del.1972); and *Torrez v. State Farm Mut. Auto. Ins. Co.*, 705 F.2d 1192 (10th Cir.1982).

These authorities, however, do not stand for the proposition Nationwide advances. Rather, they indicate that, in deciding whether or not to pay money to a claimant, an insurance company may not conclude that a judgment-proof insured will not be harmed by a claimant's litigating to judgment against the insured. The insurer, these authorities instruct us, may not reason that, because the insured is judgment proof he will not suffer if a judgment is entered against him, on the theory that he will never pay it in any event.

In this conclusion the above authorities are quite correct. Even a judgment-proof insured suffers harm if a judgment is entered against him, because the judgment affects his credit and his solvency. In weighing the harm to insureds from rejection of a claimant's settlement offer, insurance companies therefore must attribute real significance to an adverse judgment against even judgment proof insureds.

█ It is an entirely different matter, however, to say that the insurer must ignore the financial condition of the insured in estimating how various claimants will decide to act. We believe that, if faced with the question, the Delaware Supreme Court would hold that in deciding what is in the best interest of the insured the insurer need not ignore facts, such as the depth of the insured's pockets, when those facts may have an impact on what claimants will decide to do and therefore on what response to the claimants is in the insured's best interest.

█ This issue, then, is much simpler than Nationwide has made it. The injury to the insured in a case brought against the insurer for bad faith failure to settle takes the form of a judgment against the insured which would not have been obtained had the insurer fulfilled its duty. The question whether the insurer's conduct caused this injury, by inducing claimants to sue the insured, is a simple question of causation, like any other causation question, for example, in any garden variety tort case. If the claimants would not have sued if the insurer had interpled, then it should be possible for a jury to find that the insurer's failure to interplead was a proximate cause of the plaintiff's injury.

It may well have been that in this case, even apart from causation, interpleader would have been an unreasonable strategy because other claimants would have pursued McNally after the Eckmans were out of the picture. If the jury had believed that, it would have determined that the insurer acted reasonably in failing to interplead.[11] But the jury was asked to assess the reasonableness of Nationwide's conduct. The jury has given its assessment, and the record supports its conclusion.

---

**11.** Nationwide also argues that this question was not squarely presented to the jury, so that we cannot take the jury's finding as a response to this question. We discuss and reject this claim below, in section VII.

## V. The Proximate Cause of the Rejection of the Settlement Offer

■ Nationwide also uses the conditional nature of the settlement offer as the basis for a proximate cause-based attack on the judgment. Nationwide argues that, because the offer required acceptance by both Nationwide and CNA, and because CNA did not accept the offer, there is no way the jury could have found that Nationwide's failure to accept it caused the offer's rejection or, therefore, McNally's injury.

We reject this argument for two reasons. First, the district court gave an entirely acceptable instruction to the jury on proximate causation, which Nationwide does not attack. Second, there is evidence in the record from which the jury could have concluded that CNA actually had decided to accept its part of the Eckman offer, and that CNA communicated that decision to Nationwide and attempted to elicit Nationwide's cooperation so that the Eckman claims could be resolved. CNA's senior claims analyst, Edward Woynich, testified that on October 14, 1981 he ordered his subordinate William Schuster "to settle the Eckman claim for $100,000." 1394–96A. Schuster testified that on the day he received this order from Woynich, he spoke with CNA's attorney on the Eckman claim, Robert Carey. 1240–41A. In turn, Carey testified that on the same day he spoke with Nationwide's attorney, Morton Kimmel, about Nationwide's settlement intentions. 1427A. On the basis of this evidence the jury could have found that the Eckman offer was not accepted by Nationwide and CNA only because Nationwide rejected it.

Nationwide's argument that its rejection of the offer did not cause McNally's injury is in essence an argument that CNA independently caused the offer's rejection. That argument was made to the jury, but

the jury rejected it. We find no reason to disturb the jury's finding on this issue.

## VI. McNally's Alleged Consent or Ratification Of Nationwide's Decision

Nationwide next attacks the judgment by arguing that McNally consented to Nationwide's rejection of the Eckman settlement demand, and that the district court improperly removed the issue of consent from the jury's consideration. The district court took these issues from the jury because it believed that on the basis of all the evidence in the record no rational jury could find either consent or ratification. Tr. at 3667. We agree.

Nationwide bases its consent argument on a single spoken remark, addressed to Morton Kimmel, Nationwide's trial attorney throughout the Delaware state court *Eckman v. McNally* litigation, by Arlen Mekler, McNally's personal attorney. Shortly before the Eckman settlement offer expired, testimony in the record suggests that Mekler told Kimmel that he (Mekler) and his client were "leaning toward" rejecting the settlement demand.[12] Similarly, Nationwide bases its ratification argument on the same evidence, and on McNally's January 25, 1982 statement that at that time he did not "want [Nationwide] to pay any money to Eckman until all of the medical information comes in." 1555A–56A. After setting out these statements Nationwide argues that it was McNally's agent, and therefore that it was justified in obeying his instructions—indeed, that it was obliged to do so.

We believe that the nature of the relationship between McNally and Nationwide precludes a finding that these remarks are sufficient evidence that McNally consented to Nationwide's rejection of the Eckmans' settlement offer, or ratified that rejection after the fact. While Nationwide is correct in arguing that it was McNally's agent, it is incorrect in its apparent contention

12. As further evidence that, before October 30, 1981, Mekler instructed Nationwide not to settle or interplead, Nationwide cites a letter from Mekler to Kimmel dated November 25, 1981, stating that "at the present we do not think it would be a wise idea to authorize Nationwide to pay its policy limits to Mr. Eckman." 365E. Nationwide also cites testimony by a number of its own employees that they thought McNally's attorney did not want Nationwide to interplead. See Nationwide Brief at 38 and record citations set out there.

(though Nationwide advances it only implicitly) that the *limit* of its duty to McNally is the duty of an agent to his principal.

■ Nationwide was not merely McNally's agent, obliged simply to carry out McNally's instructions. Nationwide was instead an expert and a fiduciary, and McNally was the beneficiary of his insurer's expertise and fiduciary duty. See 7C John Allen Appleman, *Insurance Law and Practice* § 4687 at 191 ("The insurer holds a fiduciary relationship towards its insured at all stages of the claim"). There is some authority characterizing the insurer simply as the insured's agent in settlement negotiations, see id. at § 4711 at 404. Even these authorities recognize, however, that when the insurer acts on behalf of its insured in settlement negotiations, it is acting on behalf of a party whose interest is adverse to its own. Id.

■ In a wide variety of contexts the common law instructs courts to scrutinize transactions particularly carefully when one party conducts a transaction both on behalf of himself and on behalf of another whose interest is adverse to his. The party in charge of the transaction must conform to a higher standard of care than one who is entitled to act solely in his own interest. See, for example, Restatement of Trusts (Second) § 170 (trustee's duty to deal fairly with beneficiary in direct transaction between the two concerning the trust res); George G. Bogert and George T. Bogert, Law of Trusts § 96 (id.); *Lynch v. Vickers Energy Corp.*, 351 A.2d 570 (Del.Ch.1976) (duty of majority to minority shareholders in transaction benefiting the former at the latters' expense). This extra scrutiny must also be applied when courts review an insurer's conduct of settlement negotiations on behalf of its insured. See 7C John Allen Appleman, § 4711 at 404 (footnote omitted) ("insurer's adverse interest ... subjects the insurer's acts to closer scrutiny than the acts of an ordinary agent.") Nation-

wide was obliged to act towards McNally in a way that would stand up to this kind of scrutiny.

■ Given these factors, Nationwide would not have been justified in acting on the basis of a single statement that McNally's personal attorney—who had handled the criminal charges against McNally but who had no experience in personal injury defense litigation, and the extent of whose involvement in the *Eckman* case is itself a matter of dispute—was "leaning toward" doing one thing or the other. Nationwide, by contrast, is expert in these matters, and it therefore owes its insured a higher duty than Mekler did:

> The insurer, as a professional defender of lawsuits, is held to a standard higher than that of an unskilled practitioner. What might be ignorance in one instance may be unforgivable oversight of the insurer; what might be neglect in one instance could well constitute bad faith on the part of the insurer.

7C Appleman § 4712 at 425 (footnote omitted). Nationwide was therefore obliged to use its expertise to ascertain what was in McNally's best interest.

■ For another and a simpler reason, we believe that McNally's apparent after-the-fact acquiescence in Nationwide's decision does not shield the insurer from the consequences of its choice. Both of the statements which Nationwide contends constitute affirmance of its failure to settle or interplead by October 31, 1981, in fact concern interpleader after that date: one relates to interpleader in November of 1981, while the second concerns interpleader in January of 1982. These statements have nothing to do with the decision whether or not to settle or interplead in response to Tybout's settlement demand. They therefore cannot constitute affirmance of Nationwide's failure to accede to that demand, and for that reason in turn they cannot be the basis for ratification of that failure.[13]

---

13. Nationwide relies on *Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 775 F.2d 76 (3d Cir. 1985) to show that the question of McNally's consent should have been submitted to the jury. (In *Puritan* this court predicted Pennsylvania,

not Delaware, law, but we have no reason to believe that the two states differ in their regulation of the conduct before us.) As a matter of law, *Puritan* recognized the viability of a consent defense in bad faith refusal to settle cases.

## VII. *New Trial Issues*

Nationwide advances several arguments which it contends require us to vacate the judgment entered by the district court and to order a new trial. We reject all of these arguments. We deem two worthy of brief comment; the remainder are identified below in note 13.

### A.

■ Nationwide attacks the district court's formulation of the special interrogatories with which the jury was instructed to give its decision. Nationwide argues that the interrogatories were deficient because, inter alia, they "did not [contain] separate questions relating to a duty to settle and a duty to interplead," and because there were no "explicit [. . .] proximate cause interrogatories concerning CNA's non-response to the joint settlement demand." Nationwide Opening Brief at 42.

Nationwide's objection regarding the failure to pose separate questions on settlement and interpleader rests on its contention that the district court improperly imposed upon Nationwide the duty to interplead. See Part IV of this opinion, at 262, above. From this premise Nationwide reasons that we must be able to know whether the verdict rested on the jury's decision that Nationwide had breached its duty to settle or its duty to interplead, so that we can ascertain whether or not the verdict may stand; and that as posed the interrogatories are deficient because they do not permit a court to know the basis for the jury's decision.

The difficulty with Nationwide's argument is that it is uncontested that Nationwide neither settled nor interpled by the October 31, 1981, deadline. In some cases more than one factual scenario is presented to the jury, which is then asked to decide which one actually took place. If the jury finds for the plaintiff, and on appeal it is held that one of the scenarios presented to the jury could give rise to liability while another could not, it is essential that the jury have articulated which scenario it found to be the real one: otherwise the court cannot tell whether the verdict for plaintiff was premised on a set of fact which should, or should not, give rise to liability.

Here, however, there is no doubt as to whether or not the jury believed that Nationwide had failed to settle or interplead before 31 October, 1981: the parties are agreed that Nationwide did neither. In addition we have held that, on the facts of this case, the district court did not err in permitting the jury to impose on Nationwide a duty to interplead. These two facts each independently dictate the conclusion that it was unnecessary for the jury to explain whether it believed Nationwide's breach of duty lay in its failure to settle or its failure to interplead.

■ Nationwide also attacks the special interrogatories as improper because, Nationwide contends, they did not spell out the proximate causation issue with sufficient clarity. Under rule 49, Fed.R.Civ.P., however, the formulation of special verdict interrogatories is within the district court's discretion. *Kornicki v. Calmar Steamship Co.*, 460 F.2d 1134, 1139 (3d Cir.1972); 5A James Wm. Moore, *Moore's Federal Practice* 49–16 (1985) (footnote omitted) ("it is within the trial judge's discretion to structure the special verdict interrogatories"). "The only limitation [on this discretion] is that the questions asked of the jury be adequate to determine the factual issues essential to the judgment." *Kornicki*, 460 F.2d at 1139.

■ The interrogatories submitted to the jury on this issue satisfy that standard. By asking whether "if Nationwide had [settled or interpled] the Eckmans' judgment against McNally would not have been en-

---

We do not question that holding here. But *Puritan* is radically different on its facts from this controversy, for there was no question that the plaintiff in that case had in fact approved of the litigation strategy it was challenging in court. The only issue then before us was the legal effect of that approval. Here, we conclude simply that, on the facts, there was not sufficient evidence of consent to warrant asking the jury whether McNally had in fact approved of the litigation strategy he now challenges.

tered" the interrogatories properly ask the jury to decide whether Nationwide's breach of duty, if there was one, caused McNally's injury, i.e. the Eckman judgment. The causation issue is therefore dealt with by the interrogatories. We do not believe that the district judge was obliged to distill the causation issue any more finely than this.

### B.

██ Nationwide also argues that the district court mischaracterized the standard by which Nationwide's conduct should be judged because the district court told the jury that Nationwide was required "to exercise that degree of care which a reasonably prudent insurance company would exercise under the same circumstances to see that the interests of the insured are protected." 2494A. Our discussion of the law governing bad faith failure to settle cases, at page 260 above, demonstrates that Nationwide is wrong on this issue, and that the district court's instruction was proper.

██ Nationwide cites *Casson v. Nationwide Insurance Co.*, 455 A.2d 361 (Del. Super.1982), as support for what it asserts is the rule that the claim in this case should be resolved by determining whether or not the insurer's conduct "was clearly without any reasonable justification." *Casson*, 455 A.2d at 369. *Casson* does indeed impose

that standard, but not on an insurer in the same position as Nationwide has assumed in this case. There the insurer had failed to pay a claim made by its own policy holder. In that situation the insurer has not assumed the defense of a lawsuit against the insured. The fiduciary duty to conduct such litigation in a particular way is therefore absent, and the standard of care to which the insurer's conduct must conform is therefore less rigorous than it is in a case like the one before us.[14]

██ For these reasons we conclude that the district court's judgment on Nationwide's liability to McNally must stand. We are persuaded that the district court's instructions to the jury properly stated Delaware law governing a suit charging that an insurance company has failed in bad faith to settle a claim against its insured. Indeed, while Nationwide has sought to characterize its attack on the verdict below as a challenge to the legal framework in which the case was tried, Nationwide's appeal is more accurately understood as an attack on the jury's factual findings.

The plaintiff in this case argued to the jury that Nationwide acted as it did in order to minimize its own loss from the accident, and without sufficient regard to the extent of the loss McNally would sustain as a result of Nationwide's own conduct. There is evidence in the record to

---

14. Nationwide also argues that the trial court erred by giving the jury only a general instruction about the possible bias of witnesses with a financial interest in the outcome of the case, rather than giving a specific instruction about Tybout's testimony. We reject this claim because we are satisfied that the general instruction gave the jury the information it needed to evaluate the testimony of all witnesses, including Tybout. Nationwide contends further that the trial court erred by permitting McNally's counsel to tell the jury that Nationwide was trying to "chisel" McNally's victims so that it could save money. That, however, was McNally's theory of the case, and his lawyers were free to argue that theory to the jury. While a less pejorative term might well have been used, we do not think that the challenged locution is so prejudicial as to require the granting of relief. Finally, Nationwide contends that the judgment should be reduced by the difference between the $200,000 which the Eckmans actually took from the interpleader fund and $600,000, the amount of money Nationwide contends the Eckmans

would have received had they attempted to get more than the policy limits from the interpleader fund. But Nationwide identifies no source of this obligation to mitigate damages, and we can find none ourselves. Indeed, given the term of McNally's policy, we find the theory most problematic. While it may be that the Eckmans would have succeeded if they had sought more than the per person policy limits from the interpleader fund, they also might have failed. If, to minimize his damage,

> a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than the other is chosen. Sometimes a reasonable man might consider that either active efforts to avoid damages or a passive awaiting of developments are equally reasonable courses. If so, a failure to act would not be penalized, ... even though it later appears that activity would have reduced the loss.

Charles T. McCormick, Handbook on the Law of Damages 134 (1935).

support this contention, some of which has already been alluded to in this opinion; see also the testimony of Abraham Vereide, a Nationwide claims manager, at 745A–751A concerning his attempt to ascertain the amount of its policy limits which Nationwide could avoid paying to the victims of McNally's accident. Nationwide in turn put on evidence, chiefly that of its own employees, that in deciding how to conduct McNally's defense it had attempted only to protect its insured, not to save its own money. The jury's decision on this issue is supported by evidence in the record. It is therefore not our task to question that decision.

We are equally persuaded that the special interrogatories given to the jury elicited the jury's decision about the case with the requisite degree of specificity. That leaves only a single issue to be decided, namely the rate at which post-judgment interest should accrue in this case. We turn now to that question.

### VIII. *The Applicable Rate of Post-Judgment Interest*

As we have noted, the parties have stipulated that damages were $2.95 million, the difference between the amount of the Eckmans' verdict against McNally and the amount the Eckmans received from the interpleader fund, plus the interest which Delaware law provides should accrue on the court's judgment. The rate at which interest accrues is determined by the Delaware law governing post-judgment interest. That law is codified at 6 Del.Code § 2301 (1980).

Interpreting that statute, the district court ordered that interest would accrue on the jury's verdict at the rate of 17% until paid. Nationwide challenges this ruling, arguing that the applicable provision requires that interest fluctuate at 5% above the Federal Reserve discount rate. Over the period since the district court entered judgment in this case, the Federal Reserve discount rate has moved between 12% and 5.5%. Nationwide therefore contends that the interest rate on the McNally judgment

should fluctuate between 17% and 10.5%. We conclude that Nationwide is wrong.

Section 2301(a) of 6 Del.Code provides in pertinent part that the rate of post-judgment "interest shall be 5% over the Federal Reserve discount rate." McNally argues that this means that the rate should be set once and for all as of the date the judgment is entered. Since it is undisputed that the Federal Reserve discount rate was 12% when the district court entered judgment in this case, McNally argues, Nationwide should pay 17% interest until the judgment is paid.

As support for this position both McNally and the district court rely on *Devex Corp. v. General Motors Corp.*, 749 F.2d 1020 (3d Cir.1984), cert. denied, —— U.S. ——, 106 S.Ct. 68, 88 L.Ed.2d 55 (1985). There we discussed the application of the federal post-judgment interest statute, 28 U.S.C. § 1961. That statute requires that post-judgment interest in federal courts "shall be calculated from the date of the entry of the judgment, at the rate allowed by State law." We concluded that § 1961 required the federal courts to borrow "from Delaware law only its current interest rate of 16%." *Devex*, 749 F.2d at 1023. This is the result McNally seeks, for "current" was understood in *Devex* to mean the rate in force at the time judgment was entered. *Id.*

*Devex* does not speak to our question, however, which is not which state rate— the rate applicable on the day judgment was entered or, if they are different, the rate governing the judgment throughout the time it is unpaid—the federal statute requires us to borrow. Our question is instead what rate the state law requires us to borrow, i.e. what the state rate is *both* on the date judgment was entered and throughout the period during which the judgment remains unpaid. Because the *Devex* court concluded that § 1961 borrowed only the rate in force on the date judgment was entered, it did not have to decide what the Delaware rate was for the remainder of the period during which the judgment remained unpaid.

In support of his contention McNally also cites *Rollins Environmental Services, Inc. v. WSMW Industries, Inc.*, 426 A.2d 1363 (Del.Super.1980). That case does indeed attach the meaning to 2301(a) which McNally argues the section has: *Rollins* holds that the interest rate established by § 2301 is a single, fixed rate, which may not fluctuate. It holds further that the rate is fixed as of the date the judgment it is attached to is entered. Thus "a calculation would be made based upon the Federal Reserve interest rate on a certain date and the interest rate produced by that calculation would be the interest rate applicable to the claim until paid." 426 A.2d at 1367.

Nationwide cites a later case from the Court of Chancery of Delaware, however, which holds that post-judgment interest should "be calculated according to the fluctuations of the federal discount rate since" the date upon which it began to accrue. *Church Home Foundation, Inc. v. Victorine and Samuel Homsey*, No. 6513, LEXIS slip op. (Del.Chanc.Ct. Aug. 29, 1983). That case, as McNally has observed, was in equity, and the chancellor in equity is not completely bound by the law governing post-judgment interest. *Rollins*, 426 A.2d at 1366. The court in *Church Home*, however, appeared to be simply construing § 2301: Vice Chancellor Longobardi based his analysis on "the established legal rate as found in 6 Del.C. § 2301." LEXIS Slip op. at 2. An even later opinion by the Delaware Superior Court, *Uhde v. Nanticoke Memorial Hospital*, No. 75–718, LEXIS slip op. (Del.Super.Ct. Dec. 30, 1985), however, holds the other way, applying a single rate of interest over the entire period during which the judgment remained unpaid, and calculating that rate by adding 5% to the Federal Reserve discount rate in effect on the day the judgment was entered. The Delaware Supreme Court has not addressed the issue clearly.[15]

The current version of § 2301 was passed by the Delaware legislature to eliminate the "hardship that results from the disparity between the prevailing interest rate and the traditional interest rate allowed in" the Delaware courts. *Rollins Environmental Services, Inc. v. MSMW Industries*, No. 78–244, LEXIS slip op. at 2 (Del.Super.Ct. March 6, 1981). Consistent with the legislative intention it seems to us that that hardship would be eliminated most effectively by allowing the post-judgment interest rate to fluctuate with the real cost of money over the time during which the judgment is not paid. Setting the rate once and for all on the date judgment is entered will encourage the payment of judgments more strongly when interest rates fall after the entry of judgment, as has occurred since judgment was entered in this case. But when interest rates are rising the rule for which McNally contends will have the opposite effect. This suggests that the statute means what Nationwide suggests it means.

We conclude, however, that the structure of the statute requires us to reach the opposite result. Section 2301 does not only govern the rate of post-judgment interest. The same words which we are construing also govern the maximum rate at which loans may be made within the state. That maximum, in turn, like the rate of interest on loans themselves, is fixed as of the date the loan agreement is entered into. Even if a loan is to be repaid over a period of several years, § 2301 provides, the maximum rate of interest on that loan is determined by the rate of interest in effect on the date the loan commences.

In order to reach the result Nationwide advocates, therefore, we would have to construe § 2301 to mean one thing for loans and another thing when the provision serves to determine the rate of post-judgment interest. This seems unreasonable; at least it seems more reasonable to read the words to have the same meaning in both contexts. We are certain that, in the loan context at least, § 2301 imposes a single fixed rate which governs for as long

**15.** The Delaware Court has observed in passing that under § 2301 post judgment interest should be paid at "post-April 18, 1980 *rates*." *Stephenson v. Capano Development, Inc.*, No. 11 (Del. Feb. 21, 1985) at 3 [497 A.2d 791 (table) ] (emphasis added). We believe this reference is too oblique to be helpful to us.

as the liability it affects is outstanding. We therefore conclude that the Delaware Supreme Court would hold that the section must mean the same thing here, and accordingly that it requires the rate of post-judgment interest to be determined once and for all as of the date judgment was entered.

### IX. *Conclusion*

For the foregoing reasons the judgment of the district court will be affirmed in all respects.