600 So.2d 1147 (1992)
UNITED STATES FIRE INSURANCE COMPANY, Appellant,
v.
MORRISON ASSURANCE COMPANY and Alexander Underwriters General Agency, Inc., a/k/a Alexander Underwriters, Inc., Appellees.
No. 91-1234.
District Court of Appeal of Florida, First District.
May 15, 1992.
Rehearing Denied June 17, 1992.
*1148 Richard A. Sherman and Rosemary B. Wilder, Fort Lauderdale, for appellant.
William C. Baker, Pensacola and Larry Klein and Randy Ellison of Klein & Walsh, P.A., West Palm Beach, for appellees.
SMITH, Judge.
United States Fire Insurance Company (U.S. Fire) appeals a final judgment for appellees, Morrison Assurance Company and its agent, Alexander Underwriters, (hereinafter Morrison), in their suit for damages brought after Morrison, the excess carrier, was required to pay an excess verdict on behalf of the parties' common insured, Daniel Ornamental Iron Company (Daniel). Morrison successfully contended below that the primary carrier, U.S. Fire, wrongfully failed to settle within its policy limits thereby exposing Morrison to liability on its excess insurance contract. We affirm.
On or about November 13, 1981, Daniel, in order to pass a building inspection on a condominium project, left a part of a safety rail unsecured but in a position where it appeared to have been finally installed, when in fact it was not actually fastened down. Daniel's employees intended to return the next day to secure the railing. Roger Mills, a carpenter, was working in the same third-floor area of the project, replacing some fascia wood. At one point he unhooked his safety belt, and while walking on the outside of the railing, grabbed onto the unfastened railing, which came loose, causing him to fall backwards three flights to the first floor.
Mills' primary treating physician was Dr. Saiter, a Mobile, Alabama orthopedic surgeon. His injuries included a broken bone in the right knee cap, two fractured ribs, fractures of the collar bone and shoulder blade, and a fracture of the right thumb. He also had two slipped vertebrae in his neck. Mills and his wife hired Lefferts Mabie and Daniel Scarritt, members of a prominent Pensacola law firm, to represent them in their suit against Daniel, filed August 18, 1982.
Daniel had primary coverage with U.S. Fire for $500,000 and excess coverage with Morrison for $2,000,000. U.S. Fire assigned the defense of Daniel to Larry Hill, a highly respected and experienced Pensacola attorney. Daniel's defense was to be Mills comparative negligence in working on the project with his safety belt unhooked *1149 and his carelessness in failing to notice the condition of the unfastened railing.
In May, 1983, Daniel notified Morrison of the Mills' claim. Bill Bell, claims manager for Morrison, wrote U.S. Fire's claims adjuster, Mark Green, on May 24, 1983 asking to be advised of the status of the case and any offers or negotiations towards settlement. Mark Green responded by letter dated June 8, 1983 describing Mills' injuries and advising that evaluation of the case for settlement purposes was not likely until January, 1984, when the treating physician estimated that Mills would reach maximum medical improvement. Green closed the letter by saying that U.S. Fire's file was available for review at any time, and to please advise him of any questions.
On October 21, 1983, Mark Green sent a memorandum to his supervisor, Bob Brialmont. In the memo, Green stated that U.S. Fire's attorney had evaluated the Mills' damages to be in the neighborhood of $500,000. Earlier, in a memorandum dated May 13, 1983, he had advised Brialmont that there was excess coverage with Morrison.
At the trial below Larry Hill explained, contrary to the contents of Mark Green's October 21, 1983 memorandum, that he never evaluated damages to be in the neighborhood of $500,000. Instead, he testified that he always felt the top settlement value was $250,000. He estimated Mills' comparative negligence to be 15 to 25 percent. He estimated the jury range based upon 100 percent liability to be $150,000 to $400,000, and when Mills' comparative negligence was computed, he estimated the ultimate jury range to be $75,000 to $200,000.
Despite Mark Green's May 13th memorandum to him, Bob Brialmont maintained below that he did not become personally aware until early September, 1984, that Daniel had umbrella coverage. Apparently, Daniel and/or U.S. Fire had indicated in answers to interrogatories that there was no other insurance except Daniel's policy with U.S. Fire. This erroneous answer to the interrogatory caused confusion. Aside from Bob Brialmont's contention that he did not become personally aware of the umbrella coverage until September, 1984, it appears that counsel for the Mills were also unaware of the umbrella coverage, which explains the settlement offer detailed below.
Initially, the Mills' lawyers had valued the case at $750,000 for settlement purposes. U.S. Fire made two structured settlement offers which did not approach this figure. On August 30, 1984, Daniel Scarritt wrote defense counsel and offered to accept U.S. Fire's policy limits of $500,000. Scarritt explained that this decrease in the Mills' demand was not due to any "weakness in our legal position," but that they were "willing to allow your insurance company to protect its insured by settlement for the full value of the insurance policy limits."
In the meantime, defense counsel wrote a letter to U.S. Fire acknowledging Mills' extensive damages, and advising that as to the defense of comparative negligence "juries are reluctant to assign a great deal of comparative negligence to a plaintiff who has been seriously injured, such as the case herein." Nevertheless, U.S. Fire did not accept the Mills' settlement offer, which remained open through the subsequent trial.
On September 14, 1984, Scarritt told Hill that the Mills would be calling Dr. Flynn, a local physician, to testify at trial. Dr. Flynn's estimation of Mills' impairment greatly exceeded the estimation given by Dr. Saiter. Trial was originally set for September 17, 1984, however, it was postponed in order that defense counsel might depose Dr. Flynn.
Meanwhile, on or about September 4, 1984, it became generally known among the parties that in fact, Daniel did have umbrella coverage. Bob Brialmont, who took over Mark Green's cases when he left his employment with U.S. Fire in December, 1983, and who maintained, despite the memorandum of May 13, 1983, that he was not personally aware of the umbrella coverage until September 4, 1984, began efforts to track down the umbrella carrier to place the carrier on notice. Except for Mark *1150 Green's singular letter of June 8, 1983 to Bill Bell, Morrison had not been given any information or advised in any manner concerning the progress of this case.
Eventually, Brialmont had a telephone conversation with Bill Bell's successor, Karl Lorenz. This was followed by a letter dated October 1, 1984 describing the accident and injuries. He told Lorenz:
We have made numerous efforts to conclude this matter by either a cash settlement or annuity settlement and the latest offer made to the plaintiff would produce $588,000 and the cost of same was $234,664. This offer was made on Sept. 18, 1984 and that is the last offer we have made. The demand for settlement at this time is in the amount of $500,000 and I do not feel that the claim has that value although the expert medical doctor that the plaintiff is now bringing in will state that he has a [sic] aggravation of his previous traumatic cervical fusion and will increase the disability rating above the 8% given by the treating physician.
I do not feel that we can prevail on liability and the demands are more than the value of the claim. Because of the possible exposure to your policy, I felt I should advise you of the present status of this matter and of course I would appreciate any thoughts you may have concerning same.
The letter was received October 2, 1984.
Meanwhile, the jury in the Mills lawsuit was picked and trial commenced October 3, and ended October 5, 1984. The Mills were awarded $900,000 and Mills was found 5 percent comparatively negligent, which resulted in a total verdict for them of $855,000. Defense counsel, Larry Hill thought the chances of prevailing in an appeal were remote. No appeal was filed.
Morrison paid the excess judgment and filed suit against U.S. Fire, asserting a common law claim for bad faith and a claim of statutory bad faith under section 624.155, Florida Statutes. U.S. Fire answered, raising several affirmative defenses, among them that the excess carrier was guilty of comparative bad faith for failing to protect its insured, Daniel.
At the trial Morrison argued, and the jury could well have concluded, that U.S. Fire knew or should have known that Mills, who made $11 an hour before the accident, would be reduced to making $4 to $6 an hour, and that when this drop in earning capacity was computed over the 30 years he had remaining to work, Mills had suffered a loss in the neighborhood of $400,000, without consideration of damages for pain and suffering, and damages recoverable by his wife. Morrison also argued to the jury that U.S. Fire could not reasonably expect that Dr. Saiter's opinion would change this figure, because although Saiter's impairment rating was less than Dr. Flynn's, in essence, Dr. Saiter agreed that Mills could not return to his occupation as a carpenter. Morrison further argued that the bad faith occurred when U.S. Fire unreasonably failed to pay its policy limits and settle this case when it had the opportunity to do so.
The jury returned a verdict, using a special verdict form, finding that U.S. Fire had acted in bad faith toward its insured, Daniel, and Morrison, the excess insurance carrier, in failing to pay an amount up to its policy limits to settle this claim, when offering that amount would have resulted in settlement of the claim. In its verdict, the jury found that Morrison could recover on both its common law and statutory claims.
On appeal, U.S. Fire recognizes that Florida permits an excess carrier to recover against a primary carrier for failure to settle within the policy limits under the theory of equitable subrogation, Ranger Ins. Co. v. Traveler's Indemnity Co., 389 So.2d 272 (Fla. 1st DCA 1980). Nevertheless, U.S. Fire argues that to recover on an equitable subrogation claim, Morrison was required to prove an underlying bad faith claim by the insured, Daniel, against U.S. Fire. This, U.S. Fire urges, Morrison did not and could not do, because it is undisputed that it acted in good faith towards its insured, Daniel, and that it kept Daniel apprised of the case and that Daniel consented *1151 to go to trial. Thus, argues U.S. Fire, Daniel's consent to go to trial after being fully informed of the risks, bars the maintenance of a bad faith claim against the insurer. Puritan Ins. Co. v. Canadian Universal Ins. Co., 775 F.2d 76 (3rd Cir.1985). Further, U.S. Fire argues, Morrison could not recover on the alternate theory that an excess carrier may proceed against the primary carrier for breach of an independent duty of good faith between the primary and excess carrier, because Florida does not recognize such an independent duty between carriers, as a matter of law. Hartford Accident and Indemnity Co. v. Traveler's Indemnity Co., 554 So.2d 559 (Fla. 1st DCA 1989).
We find these arguments unavailing. U.S. Fire misapprehends the import of this court's Ranger decision. Ranger held that by operation of law, an excess carrier has the right, even in the absence of a contract or assignment from its insured, to maintain a cause of action under the equitable doctrine of subrogation for damages resulting from the primary carrier's bad faith refusal to settle the claim against their common insured. In so holding, the court relied upon authority which reasoned that the primary insurer should be held responsible to the excess insurer for improper failure to settle, since the position of the latter is analogous to that of the insured when only one insurer is involved. Continental Casualty Co. v. Reserve Insurance Co., 307 Minn. 5, 238 N.W.2d 862 (1976), citing, R. Keeton Insurance Law, § 7.8(d). In the decision by the Minnesota court, upon which this court relied, the Minnesota court noted that if an insured purchases excess coverage, he in effect substitutes an excess insurer for himself. Continental Casualty Co. v. Reserve Insurance Co., 238 N.W.2d at 864.
In Boston Old Colony Insurance Co. v. Gutierrez, 386 So.2d 783 (Fla. 1980), the Florida Supreme Court set forth several factors to be considered in a bad faith suit, commenting that a primary insurance company has the duty to advise the insured of settlement opportunities; to advise the insured as to the probable outcome of the litigation; to warn the insured of an excess judgment; and to advise the insured of any steps that it might take to avoid the same. Importantly, the court also recognized that an insurer's duty of good faith towards its insured requires the insurer to exercise due care in the investigation and evaluation of the claim against the insured. Id. at 785.
Through its right of subrogation, Morrison stands in the shoes of the insured and assumes the rights of the insured. Ranger Ins. Co. v. Traveler's Indemnity Co.. Accordingly, U.S. Fire as the primary carrier was obligated to conduct the defense in good faith and at a minimum give notice to the excess carrier of the critical aspects of the case as it progressed. Boston Old Colony Ins. Co. v. Gutierrez. There was abundant evidence from which the jury could conclude that U.S. Fire failed to do this. Despite a request from Morrison, U.S. Fire failed to communicate the status of this case for eighteen months. Morrison was not advised as to the settlement negotiations, the probable outcome of the litigation, or the possibility of an excess judgment; nor was it given any input into steps that could be taken to avoid an excess judgment. It was not until the eve of the trial that U.S. Fire employee, Bob Brialmont, complied with the requirements of Boston Old Colony Ins. Co. v. Gutierrez. Under the circumstances, the jury could have determined that this compliance was too late to absolve U.S. Fire of bad faith toward Morrison.
U.S. Fire places great reliance upon Puritan Ins. Co. v. Canadian Universal Ins. Co., supra, in urging reversal. In Puritan, the Third Circuit Court of Appeals, interpreting Pennsylvania law, ruled that an insured's consent, and indeed direction, to try the case after being fully informed of the risks involved is an insurmountable barrier to the maintenance of a bad faith claim by the excess carrier against the primary carrier. Puritan, 775 F.2d at 80. The Puritan court reasoned that the excess carrier, standing in the shoes of the insured, was subject to any defenses that could be raised against the insured. Id. On the record of that case, the court ruled that Puritan, as subrogee of an insured, *1152 which had been kept fully informed of developments in the case and which urged that the case be tried upon the belief that the plaintiff's expert would not be compelling and that there would be a defense verdict, could not recover. Id. at 81.
We find that U.S. Fire's reliance upon the Puritan decision is misplaced. The Puritan case is factually dissimilar from this case in several critical respects. In this case, there was evidence that Daniel was advised of the progress of the case and that Daniel consented to the trial of the Mills' lawsuit. However, unlike the Puritan case in which the insured's private counsel was advised of the possibility of an excess verdict, there was no evidence that Daniel was informed that there could be an excess verdict and that Daniel ignored the warning and directed that the case be tried. In Puritan, the plaintiff's lawyer, knowing the defense position of no liability, did not make a demand for settlement; whereas, in this case, the Mills' lawyers clearly offered to settle this case within U.S. Fire's policy limits. While in Puritan there is no indication of the extent to which the primary carrier kept the excess informed of the progress of the case, it is apparent that the primary carrier fulfilled its obligations in this regard, at least in part, because the excess carrier wrote to the primary carrier urging settlement. In this case, by contrast, communication between the primary carrier and excess carrier was virtually nonexistent. Finally, in the Puritan case, all participants involved in the case, even the plaintiff's lawyer, felt there was a very real possibility of a defense verdict. On the other hand, in this case, as outlined above, all involved in the defense of the case recognized the liability of the defendant, and that a jury finding of a large percentage of comparative negligence on the part of Mills was not likely.
A case much more factually similar to this one is Certain Underwriters of Lloyd's v. General Accident Ins. Co. of America, 909 F.2d 228 (7th Cir.1990) in which the court upheld a jury verdict finding bad faith on the part of the primary carrier toward the excess carrier. There, as here, the excess carrier asked to be apprised of the progress of the litigation, but it was not until the trial had begun that the primary notified the excess of the settlement offer. There, as here, the primary carrier sought to rely upon Puritan as a bar to recovery because the insured had allegedly acquiesced in the primary carrier's handling of the claim. The Seventh Circuit Court of Appeals ruled that consent barring recovery is a question of fact, and was not proven in that case  a case, we note, whose facts mirror many of the facts in this case.
The Lloyd's court cited with approval another decision by the Third Circuit Court of Appeals, McNally v. Nationwide Ins. Co., 815 F.2d 254 (3rd Cir.1987), issued subsequent to that circuit's decision in Puritan, in which the court held that the insured's consent was equivocal and would not act as a bar to a subsequent action by the insured against his insurer for bad faith failure to settle. The court paraphrased McNally and another pertinent decision as follows:
The McNally court further found that the inquiry into whether a defense based upon consent is available to the primary insurer is more than just an inquiry into whether consent was or was not given: because the insurer is an expert and a fiduciary, the court also must determine whether the insurer used its expertise to ascertain the insured's best interests and recommend the appropriate course of action. Id. at 265. In Insurance Company of North America v. Medical Protective Co., 768 F.2d 315 (10th Cir.1985), the court held that the primary insurer's failure to keep its insured fully informed about the course of the litigation and state of settlement negotiations barred use of the consent defense by the insurer. The court noted that the primary insurer failed to inform the insured that trial might result in a verdict in excess of the primary policy limits. It also stated that the insurer must conduct settlement negotiations in good faith regardless of whether the insured eventually will consent to the settlement. Id. at 319.
We likewise agree that an insured's consent to go to trial does not ipso *1153 facto constitute an absolute defense to a bad faith action. When an insurance policy gives the primary carrier full control of the litigation, including the right to determine whether the case should be tried or settled, as the policy in this case did, the insurer is required to exercise this authority in good faith, regardless of the insured's consent. The primary carrier has superior knowledge and should act reasonably under all circumstances and exercise due care in regard to settlements. Boston Old Colony Insurance Co. v. Gutierrez.
Accordingly, contrary to the argument advanced by U.S. Fire, Daniel's consent to try the Mills' lawsuit and Daniels agreement that the case should not be settled, does not bar Morrison's bad faith suit.[1] Because it is our view that this court's Ranger decision permitted this suit on the theory of equitable subrogation, it is not necessary to reach the question whether the excess carrier should be allowed to proceed against the primary carrier for breach of an independent duty between the carriers. Similarly, it is not necessary to reach appellant's contention that the trial court erred in failing to recognize a comparative bad faith defense, since the evidence in this case is not susceptible to the applicability of such defense, even if available. See also, Lloyd's, 909 F.2d at 230-1 (excess carrier has no greater obligation to primary carrier than does the insured; because insured's obligations were limited to the duty to cooperate in the defense of claims covered under the policy, excess carrier could not be guilty of comparative bad faith for failure to keep itself more informed about the progress of the litigation against their common insured). Appellants remaining points are without merit.
AFFIRMED.
ZEHMER and ALLEN, JJ., concur.
NOTES
[1] In its brief, U.S. Fire makes an alternative argument that Morrison conceded that U.S. Fire acted in good faith toward their common insured. We find this not to be the case. Morrison simply conceded the existence of the evidence regarding Daniel's consent to go to trial, which, as already stated, is not sufficient to bar this action.