**John K. McNALLY, Jr., Defendant Below, Appellant,**

**and**

**Henry R. Kesterson, t/a Galaxy Limousine Service, Defendant Below, Appellant,**

**v.**

**Richard L. ECKMAN and Sheila M. Eckman, Plaintiffs Below, Appellees.**

Supreme Court of Delaware.

Submitted: Feb. 21, 1983.

Decided: Aug. 23, 1983.

Morton Richard Kimmel, Wilmington (argued), Kimmel & Spiller, Wilmington, for appellant McNally.

Robert G. Carey (argued), Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellant Kesterson.

F. Alton Tybout (argued), Tybout, Redfearn, Casarino & Pell, Wilmington, for appellees.

Before HERRMANN, C.J., HORSEY and MOORE, JJ.

HERRMANN, Chief Justice:

In these appeals involving the alleged negligent operation of motor vehicles, defendant Henry R. Kesterson seeks reversal of a Superior Court judgment against him both as to liability and damages. Defendant John K. McNally, Jr. concedes liability but seeks a new trial on damages. The judgment against both defendants was in the amount of $2.9 million for the plaintiff Richard L. Eckman and $325,000 for his wife, Sheila M. Eckman.

## I.

This litigation arises from a collision between an airport shuttle van operated by Paul J. McKelvey, an agent of defendant Kesterson, and a pick-up truck operated by defendant McNally.

The material facts are not in dispute. Plaintiff Richard L. Eckman was a paying passenger in the van owned by Kesterson, trading as Galaxy Limousine Service. In the van at the time of the accident were the driver, Eckman and 11 other passengers.

As the van proceeded north on U.S. Route 13, it struck McNally's truck at the "T"-shaped intersection of Route 13 with Route 2. McNally, proceeding west on Route 2, had failed to stop at the sign controlling entry onto Route 13.

The evidence reveals that, at the time of the accident, McNally was driving his truck at least 12 miles over the speed limit; that he had been awake for at least 32 hours; that he was under the influence of alcohol; that McKelvey was driving the van at least 10 miles over the speed limit and that the collision would not have occurred had he been driving within the speed limit.

McKelvey and a van passenger were killed, and other van passengers sustained various injuries. Eckman sustained injuries that left him a paraplegic below the waist. He is permanently confined to a wheel chair; he has lost all sensation below the waist and all control of bowel and urinary functions; his lower body is deteriorating; and he faces constant pain and discomfort for the rest of his life.

Eckman and his wife brought this action against Kesterson and McNally on the ground of negligence. McKelvey's widow sued McNally alleging both negligence and wilful or wanton conduct. Motions to consolidate the actions were granted for separate trial of the issue of liability.

At the opening of the liability trial, the Court, over the objection of both Mrs. McKelvey and Kesterson, severed the McKelvey action on the ground that the jury would be confused by simultaneous consideration of both the issue of negligence and the issue of wanton conduct.

At the conclusion of the liability trial, the Trial Court directed a verdict against both

defendants on the issues of negligence and proximate cause, submitting to the jury only the question of the relative degree of fault of each defendant. Kesterson requested that the Court charge the jury on the issue of McNally's wilful or wanton conduct as it related to Kesterson's case. The Court refused the request on the ground that the McKelvey action, brought on that ground, had been severed.

The jury prorated fault at 65% against McNally and 35% against Kesterson. The case then went on to trial before the same jury on the issue of damages.

## II. Liability

Kesterson contends that the Trial Court committed reversible error in three aspects of the trial of the liability issue.

### A.

Kesterson contends that he was prejudiced unfairly by the Trial Court's severance of the McKelvey action; that the same jury should have been permitted to determine all liability issues arising from the collision because the issues were inexorably intertwined; that, as a result of the severance, he was denied a fair trial to which he was constitutionally entitled. We find this position untenable.

 We endorse the general rule that, where the issues presented against one of two joint tortfeasors include wilful or wanton conduct and against the other ordinary negligence, the question whether to grant separate trials on the issues is within the Trial Court's sound discretion; and that determination will not be disturbed on appeal unless one of the parties has been prejudiced. *See Anno.,* 174 A.L.R. 734, 744–46. The record does not reveal such prejudice to Kesterson. Indeed, the likelihood of prejudicial confusion of the jury resulting from joint trial of the issues supports the Trial Court's severance. The Court did not abuse its discretion.

### B.

Kesterson further contends that the Trial Court committed reversible error in directing the verdict and in refusing to submit to the jury the issue of whether McKelvey's negligence was a proximate cause of the collision.

According to Kesterson, the Trial Court, in ruling that Kesterson was negligent and that his negligence was a proximate cause of the collision, implicitly ruled that McKelvey, his agent, was negligent and that such negligence similarly was a proximate cause. Kesterson points to the general rule that questions of negligence and proximate cause ordinarily are issues of fact for the jury, *Faircloth v. Rash,* Del.Supr., 317 A.2d 871 (1974); he further argues that McKelvey could not reasonably have anticipated that another driver would run a stop sign at an excessive speed and while under the influence of alcohol; that McKelvey's excessive speed merely "gave rise to the occasion"; that the real cause was McNally's conduct.

 Preliminarily, we reject out of hand Kesterson's "reasonable anticipation" argument, the tenor of which seems to be that McKelvey was justified in breaking the law on the assumption that another would not. The erroneous nature of the assumption is self-evident.

 As to proximate cause: As this Court stated in *Faircloth, supra,* "when undisputed facts compel only one conclusion, the Trial Court has a duty to enter a judgment consistent therewith." 317 A.2d at 871. In this case, expert testimony established that the excessive speed of Kesterson's van not only "gave rise" to the collision, but the collision would not have occurred but for the excessive speed. Additionally, we note that Kesterson introduced no evidence to establish that his agent's conduct was a remote rather than proximate cause of the accident.

The Court did not err in directing the verdict.

## C.

Finally, Kesterson asserts that he was denied a fair trial because of the Trial Court's refusal to instruct the jury regarding the issue of McNally's wilful or wanton conduct, coupled with certain comments by counsel for the plaintiffs and McNally during their summations to the jury on the issue of damages.

The plaintiffs' attorney referred to McNally as having "drifted into a totally socially unacceptable condition" and characterized McKelvey's conduct as "deliberate [and] calculated." He later argued that "McNally will be a little bit at fault, but [there was] a calculated disregard by McKelvey." McNally's counsel argued that the "actions of Kesterson's agent, McKelvey, were a conscious disregard...." Kesterson (with obvious inconsistency) objected on the ground that counsel, in effect, were arguing wilful or wanton conduct; and he requested the Court to instruct the jury to disregard that issue.

■ As to the Trial Court's refusal to instruct the jury on the issue of McNally's allegedly wilful or wanton conduct: Kesterson reiterates his "unfair prejudice" argument against severance of the McKelvey action. As we have concluded, the Court properly severed the actions because of the likelihood of prejudicial confusion resulting from joint trial of the issues. Rejection of Kesterson's renewed attempt to interject the issue of wilful or wanton conduct at a later stage was a proper corollary to the Court's prior ruling. The Court did not abuse its discretion in this connection.

■ As to the comments of counsel regarding McKelvey: The comments were clearly inappropriate in view of the Trial Court's repeated efforts to dissociate from the instant case the issue of wilful or wanton conduct. The record, however, does not justify a holding of unfair prejudice or denial of fair trial. We find, therefore, that the Trial Court did not abuse its discretion in this regard.

## III. Damages

### A.

McNally contends that the Trial Court committed reversible error in its denial of his motions for mistrial after police officers, testifying for the plaintiffs, referred to (i) his refusal to take a breathalyzer test after the accident; (ii) the criminal proceedings against him for criminally negligent homicide; and (iii) the presence of McNally's "girlfriend" in the truck at the time of the accident (after the plaintiffs' attorney mentioned during his opening statement that McNally was married). McNally asserts that admission of the above testimony was error as a matter of law and resulted in a "punitive" and "outrageously high" verdict.

### (i)

■ As to the breathalyzer: McNally relies upon *Law v. Gallegher,* Del.Supr., 197 A. 479 (1938) in support of his argument that admission of testimony regarding his consumption of alcohol was improper since neither the complaint nor the pre-trial stipulation and order contained allegations of intoxication. *Gallegher,* however, is inapposite on its facts. The record clearly shows that McNally was apprised with "fullness and fairness" of what he could expect to defend against at trial. In light of his pre-trial motion to suppress the evidence, the conclusion is inescapable. Compare *Gallegher,* 197 A. at 482.

■ McNally further contends, relying upon *Best v. State,* Del.Supr., 328 A.2d 141 (1974), that admission of a police report containing his blood alcohol level was error in the absence of the State Chemist who performed the analysis and without a document verifying the proper operation of the blood-testing device used. *Best* is similarly inapposite. That case involved a challenge to the reliability and accuracy of a breathalyzer, a device of relatively recent origin at the time of that case. This Court, satisfied that the machine was generally trustworthy, stated:

> "Finally, we hold that the Business Records Act is applicable in this case, *Johnson v. State,* Del.Supr., 253 A.2d 206.

Accordingly, it was not error to admit in evidence thereunder documents showing that the [breathalyzer] had been checked by the State Chemist although he was not present at the trial."

328 A.2d 143. McNally interprets the quoted language as establishing a rule that, as a matter of law, a document of verification and accuracy of operation must accompany all test results when the State Chemist is not present at trial in order for such results to be admissible. That interpretation runs counter to the well-established law of this State. This Court said in *Johnson v. State*, Del.Supr., 253 A.2d 206, 208–09 (1969):

> "A business record is admissible [in a criminal trial] under the Statute [10 Del.C. § 4310] if 'in the opinion of the court' such admission is justified by the sources of information and the method and time of preparation. This gives the trial judge a breadth of discretion which will not generally be disturbed on appeal."

Delaware Uniform Rule of Evidence (hereinafter "D.R.E.") 803(6),[1] the "business records exception" to the Rule against Hearsay (D.R.E. 802), the successor to 10 *Del.C.* § 4310, vested in the Trial Court the same "breadth of discretion" to determine the trustworthiness of the report here involved. The Trial Court was satisfied that, under D.R.E. 803(6), the report was trustworthy, kept and made as it was in the regular course of police business and containing the analysis by the State Chemist of a blood sample properly identified by the police officer. We will not disturb that determination.

---

1. D.R.E. 803 provides in pertinent part:

 "Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial.

 "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 \* \* \* \* \* \*

 "(6) Records of Regularly Conducted Activity. A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the

(ii)

As to the police officers' references to the criminal proceedings against McNally: He argues that, because he plead nolo contendere to the charge of criminally negligent homicide, reference to the proceedings falls within the rule that only a plea of guilty to a criminal charge is admissible as an admission against interest in a subsequent civil trial arising from the same incident, *Boyd v. Hammond*, Del.Supr., 187 A.2d 413, 416 (1963); *see also Lawrence v. Kozlowski*, 171 Conn. 705, 372 A.2d 110, 115–16 (1976), *cert. denied*, 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977).

The Trial Court acknowledged the impropriety of the references and on three occasions instructed the plaintiffs' attorney to admonish the police officers against further mention of the criminal proceedings. Additionally, the Court offered to give the jury curative instructions, which were refused by McNally. The Court, however, denied the motions for a mistrial on the ground that, in light of the abundance of other evidence properly admitted, (McNally having proceeded through a stop sign at the end of a road, at an excessive speed, with a blood alcohol level of at least .16, without sleep for over 32 hours, resulting in the deaths of two persons), his arrest and prosecution in connection therewith were undoubtedly matters of little surprise to the jury, much less matters "highly inflammatory" and "unfairly prejudicial." We agree, and hold that the error here asserted was not so substantial as to justify reversal.

(iii)

As to the reference to McNally's passenger as his "girlfriend": the casual,

course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation and calling of every kind, whether or not conducted for profit. \* \* \*."

unsolicited remark went to McNally's credibility. Notably, McNally did not choose to rebut the remark or any inference therefrom. There was no reversible error in this connection.

\* \* \*

The Trial Court did not err in denying McNally's motions for mistrial.

### B.

■ The defendants contend that the Trial Court erred (1) in admitting the testimony of an economist which was based upon total loss of earning capacity; and (2) in submitting to the jury the issue of total as well as partial loss. As to the first assignment of error, the thrust of the defendants' argument is that the economist did not have a sufficient basis for expressing an opinion. D.R.E. 703; D.R.E. 705.[2] As to the second and related challenge, the defendants argue that the evidence of loss was not sufficient to submit the issue to the jury.[3]

In support of both arguments, the defendants rely upon the testimony of a doctor called by the plaintiffs, who testified that, as a general rule, 80% of paraplegics are employable and that Eckman, specifically, most likely could be employed at a sedentary job. The defendants further point to the testimony of a rehabilitation expert, called by the plaintiffs, who testified that, after a two-year training program, Eckman could be qualified as a draftsman in a "sheltered employment situation."

The Trial Court, over objection, admitted the economist's testimony and submitted the issue to the jury, ruling that the plaintiffs had presented evidence of loss of earning power and that the extent of the loss was a proper subject for argument. We agree.

Eckman testified, and an expert in spinal injuries corroborated, that, as a result of the accident, he suffered the extensive injuries hereinabove related. Both further testified that he is in constant pain; that he cannot sit for more than four or five hours; and that his loss of bowel and urinary control causes him extreme discomfort and embarrassment. We cannot say that, as a matter of law, the economist could not infer from the above a total loss of future earning capacity.

■ As to the submission of the issue to the jury: The decision whether a litigant has produced sufficient evidence to warrant a requested instruction is a matter within the sound discretion of the Trial Court and will not be disturbed, absent an abuse of discretion. *Coles v. Spence*, Del.Supr., 202 A.2d 569, 570 (1964).

---

**2.** D.R.E. 703 provides:

"RULE 703. BASES OF OPINION TESTIMONY BY EXPERTS.

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

D.R.E. 705 provides:

"RULE 705. DISCLOSURE OF FACTS OR DATA UNDERLYING EXPERT OPINION.

"(a) Disclosure Of Facts Or Data Underlying Expert Opinion. The expert may testify in terms of opinion or inference, provided he first identifies the facts and data upon which he bases his opinion and his reasons for the opinion, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

"(b) Objection. An adverse party may object to the testimony of an expert on the ground that he does not have a sufficient basis for expressing an opinion. He may, before the witness gives his opinion, be allowed to conduct a voir dire examination directed to the underlying facts or data on which the opinion is based."

**3.** The Trial Court instructed the jury, in pertinent part:

"\* \* \* If you find that plaintiff suffered a disability as a result of his injury and was thereby prevented from following his employment or was totally or partially disabled from following his employment, then you may award him damages for loss of earnings or earning power which he sustained as a direct, proximate result of the injuries. \* \* \*."

■ This Court held in *Henne v. Balick,* Del.Supr., 146 A.2d 394, 396 (1958), and reaffirmed in *Coles, supra,* that evidence of substantial permanent injuries and the nature of the plaintiff's vocation, standing alone, is insufficient to warrant an instruction upon decreased earning capacity or loss of future wages. We turn, therefore, to the factors before the Trial Court in this case.

At the time of the accident, then-Air Force Sergeant Eckman was 39 years old; his gross annual salary as an aircraft ground mechanic was $24,000; he planned to retire from the service 3½ years later, to acquire a civilian job and to work at that job through retirement age.

As a result of the injury: Eckman was discharged from the Air Force and has since been unable to work; as noted above, he testified, and expert testimony corroborated, that his pain and discomfort is incessant and his condition will not improve. The economist testified that, based upon certain factors,[4] including a total inability to be gainfully employed, Eckman's total loss of earnings would be approximately three quarters of a million dollars.

It is clear that there was sufficient evidence before the jury to warrant the instruction on loss of future earning capacity. Compare *Coles,* 202 A.2d at 571, and *Henne,* 140 A.2d at 397.

The Trial Court did not err in this facet of the appeal.

### C.

The defendants contend that the Trial Court committed reversible error (1) in allowing the plaintiff's economist to project future lost earnings based upon an "inflationary factor"; and (2) in refusing their request to cross-examine the economist regarding the effect of income tax on future earnings. We disagree.

4. The economist projected promotions, incremental pay raises, the entry salary in the private sector, and annual percentage increases over Eckman's work-life expectancy, in arriving at the total.

■ As to the claimed use of an "inflationary factor": The record does not contain testimony by the economist regarding "inflation." As indicated above, his projections were based, *inter alia,* upon Eckman's projected promotions and incremental pay raises. Consideration by the jury of the probability of increased earnings was clearly proper. *Steppi v. Stromwasser,* Del. Supr., 297 A.2d 26, 28 (1972).

■ As to the Trial Court's refusal to allow cross-examination: The defendants urge the Court to abandon the well-settled rule in Delaware that the effect of taxation on future earnings is too speculative for the jury to consider when formulating an award. *See High v. State Highway Dept.,* Del.Supr., 307 A.2d 799, 804–05 (1973); *Gushen v. Penn Central Transp. Co.,* Del. Supr., 280 A.2d 708, 710 (1971); *Abele v. Massi,* Del.Supr., 273 A.2d 260, 261 (1970).

The defendants, however, did not attempt to introduce at trial any evidence regarding the effect of taxation on Eckman's future earnings. Absent an effort by the defendants to provide a record basis for error, we decline to review anew established Delaware law. *Delmarva Power & Light Co. v. Burrows,* Del.Supr., 435 A.2d 716, 719 (1981).[5]

### D.

We now turn to the first of the two most significant grounds for appeal in this case: the application of the "golden rule" in arguments to the jury on the plaintiffs' behalf.

During his opening statement, the plaintiffs' attorney stated:

"Everyone almost turns off his mind to pain, to the pain of others who want to get away from it. Everyone, the most human instinct is to avert your eyes when you see a hideous injury or scarred face.

5. We note that defense counsel did properly argue to the jury, and the Trial Court later instructed the jury, that an award would not be subject to taxation. *See State Highway v. Buzzuto,* Del.Supr., 264 A.2d 347 (1970).

That's only minimally the case here, but you look away from them. Here, if I can, to the best I can, I want to ask you to direct your attention and say, 'I won't turn my mind off to these horrors. I will look at them fully and I will reach a decision which fully and fairly compensates those—this couple for what has happened to them.' "

And during his closing argument, counsel stated:

"Suppose you had just one of the elements of these damages. How would you come to grips with it? And I said at the outset, I have to talk about some things that most of you don't talk about even to your most intimate friends, perhaps your spouse, without some sense of selfconsciousness. Bowels and bladders and wasted legs, things so terrible that all instinct is to close the mouth, to be unwilling to think about them, to turn away. All instinct is to minimize, to say, 'It can't be. I can't grasp this.'

"You must try. That's what the job you have here is. Suppose the only claim was these accidents, lack of bowel control, slipping of a condom, the embarrassment of happening anytime for the next thirty years, as for the last year and eight months. Suppose that was all you had to deal with. Would the claim be enormous? I think it would. Suppose the—all you had to do was the bladder and the bag strapped to the leg and the switch at night of the urine bag. Would the claim be enormous? To do it forever? I think it would. Suppose you had only to do with wasted, useless legs? What would you do? Suppose all those things.

\* \* \* \* \* \*

"The pain went on and on. It's in the record, in the hospital, and that was excruciating. And if that alone were the basis for an award, the award would be immense, I suggest. Can you imagine ten weeks with a roll ten inches big holding your back up like that? Try it for ten minutes and it's excruciating." (Emphasis supplied.)

The defendants objected to the above-quoted remarks and moved for a mistrial on the ground that plaintiffs' counsel was, in effect, making a "golden rule" argument—asking the jurors to place themselves in the position of the plaintiffs—as proscribed in *Delaware Olds, Inc. v. Dixon,* Del.Supr., 367 A.2d 178 (1976). The Trial Court denied the motion, finding (1) that plaintiffs' counsel generally was not asking the jurors to place themselves in the plaintiffs' position but was merely imploring the jury to confront Eckman's condition; and (2) that any possible prejudice resulting from the "Can you imagine . ..." remark was *de minimis.* Additionally, although defense counsel did not request a specific curative instruction, the Court later instructed the jury generally not to be influenced by sympathy in rendering their verdict.

On appeal, the defendants renew their contention that *Dixon* requires a new trial on damages. We disagree. In *Dixon,* this Court held that the Trial Court's failure to give a specific cautionary jury instruction to disregard a "golden rule" argument constituted reversible error. 367 A.2d at 179. *Dixon* is inapposite on its facts. In that case, counsel repeatedly and expressly urged the jurors to place themselves in the plaintiff's position. Here, however, viewing the opening and closing arguments in their entireties, it is clear that plaintiffs' counsel intended to ask the jury to focus on both the nature of the injuries here involved and on the claim for general damages as well as lost earnings. We are of the opinion that the argument of plaintiffs' counsel did not rise to the status of the prohibited "golden rule" argument, such as to justify reversal in this case.

■ We pause to note, however, that, as a general rule of trial advocacy, phrases such as "Suppose you had just one of the elements . . ."; "Suppose that was all you had to deal with . . ."; or "Suppose all you had to do was . . .," or variations thereof as appear in this case, are ill-advised and come perilously close to crossing the *Dixon* line of prohibition.

■ We are satisfied, nevertheless, as was the Trial Court, that the possible effect of counsel's "Try to imagine ..." and "Suppose . . ." remarks in this case were *de minimis,* and that any possible prejudice was cured by the Trial Court's cautionary, albeit general, instruction. *Bew v. Williams,* Fla.App., 373 So.2d 446 (1979).

#### E.

The remaining significant ground of appeal is this: The defendants challenge other remarks made by plaintiffs' counsel during his opening and closing arguments. During the opening, he stated in pertinent part:

" * * * the injury to Sergeant Eckman is disasterous and the consequences to his life are major, enormous—that's not the problem. The problem is in trying to translate in a few days before you the magnitude of the injury and somehow help you try to reach some understanding in terms of figures for the general damages which far exceed the—any kind of funds that any of us deal with, funds that have the things that you read about in the newspapers; the figures baseball players and basketball players get for a few years. Personal incomes of a different kind, but this is the kind of magnitude of damages that you will be forced to consider, to deal with." (Emphasis supplied.)

And during the closing he stated as follows:

"Ladies and gentlemen of the jury, I told you at the outset of this case that this is the most difficult part of the case, perhaps the most difficult case I've ever had to try to put before you, not because there's any question of the damages or the injuries. The injuries are so self-evident that they hardly need me to discuss them in detail. The difficulty which I face and which I find almost insurmountable is to try to convey the magnitude of these injuries to you in terms of dollars. Dollars are the only way you can compensate these two plaintiffs, and we're talking about a magnitude which none of us

really ever deal with, the kind of thing we see in the newspapers, read about the costs of military equipment and income of baseball players and basketball players and commentators, and they're not something that touches our lives.

\* \* \* \* \* \*

"But you may say because you're going to come up with different figures when you start your discussion—you may say some may be startled with the figures some others come up with, 'How could that really benefit him? What could he do with it?' And I say to you that's irrelevant to the issues in this case. The question is fair and reasonable compensation, and that's not for you to consider such matters as what could he do with it. You might easily ask the same question of the hundreds of multi-millionaires around the Wilmington area. What do they do with it? What do they need with it? You might ask Mike Schmidt of the Phillies what he needs nine million dollars for playing baseball for the Phillies for five years for. What's he going to do with it?" (Emphasis supplied.)

The defendants moved for a mistrial upon the basis of the above-quoted and underscored language. The thrust of their argument was that plaintiffs' counsel was attempting by his remarks to suggest improperly to the jury an inflated and specific damage amount.

The keystones of the defendants' argument were *Colfer v. Ballantyne,* 89 Ariz. 408, 363 P.2d 588 (1961) and *Faught v. Washam,* Mo.Supr., 329 S.W.2d 588 (1959). In *Colfer,* plaintiff's counsel, in discussing the measure of damages, referred to the specific salary of Marlene Dietrich and the specific earnings of several race horses. 363 P.2d at 591–92. The Arizona Supreme Court found the remarks improper, stating that:

"The reference to Marlene Dietrich and to race horses was not relevant to the issue as to plaintiffs' damages and did not call upon the jurors to exercise judgment and experience in connection with the

ordinary everyday affairs of life in evaluating testimony."

*Id.* at 592. The Court held that, based upon the overall cumulative effect of these comments and additional improper conduct of counsel, the Trial Court did not abuse its discretion in granting the defendant's motion for a new trial. *Id.*

Similarly, in *Faught,* plaintiffs' counsel in argument to the jury referred to the specific salaries of Stan Musial and Ted Williams and stated that "[t]he average professional baseball player gets $25,000 to $30,000 in one year playing ball." 329 S.W.2d at 601. The Missouri Supreme Court disapproved the remarks, finding that (1) the references to Musial's and Williams' salaries were irrelevant to the issue of damage to the plaintiff (a service station attendant); and (2) reference to the "average professional baseball" salary was both irrelevant and based upon a matter not in evidence. 329 S.W.2d at 601. The Court held that, those remarks, together with other errors in the trial, created a cumulative prejudicial effect requiring reversal of the judgment.

The Trial Court in the instant case denied the mistrial motion, apparently finding *Colfer* and *Faught* inapplicable. The Court held that "[t]he reference to salary was not in reference to what they should do in this case, [but] only what somebody does with their money. . . ."

On appeal, the defendants continue to rely on *Colfer* and *Faught* in arguing that the remarks were unfairly prejudicial and that the Trial Court, therefore, committed reversible error in denying the mistrial motion. The plaintiffs contend that counsel's remarks did not suggest to the jury that a damage award should be equal to or measured by a salary or other amount; that the purpose of the remarks was to admonish the jurors not to concern themselves with what the plaintiffs' may do with a damage award if an award is otherwise warranted.

■ Counsel's specific references to Mike Schmidt's salary and to the income of "hundreds of multi-millionaires around the Wilmington area" were improper and beyond the scope of fair and legitimate argument. While counsel in the case at bar did not present a "mathematical formula" for damages as disapproved in *Henne v. Balick,* Del.Supr., 146 A.2d 394 (1958), our view of the matter is based upon several grounds:

(1) Counsel made no reference to any matter in evidence or any permissible inference therefrom. *See Faught,* 329 S.W.2d at 601; 75 Am.Jur.2d *Trial* § 251 (1974); (2) the substance of the remarks were not matters of common knowledge. 75 Am.Jur.2d *Trial* § 252 (1974); 88 C.J.S. *Trial* § 181b (1982); (3) the remarks were plainly irrelevant to the positions of the plaintiffs and their damages; *Colfer,* 363 P.2d at 592; *Faught,* 329 S.W.2d at 601; *See* D.R.E. 401;[6] D.R.E. 402;[7] and (4) the remarks, even if relevant for the purpose espoused by plaintiffs' counsel, carried with them the dangerous potential of the impermissible suggestion of a verdict for general damages. *See Henne,* 146 A.2d at 398; D.R.E. 403.[8]

---

**6.** D.R.E. 401 provides:

"RULE 401. DEFINITION OF 'RELEVANT EVIDENCE.'

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**7.** D.R.E. 402 provides:

"RULE 402. RELEVANT EVIDENCE GENERALLY ADMISSIBLE; IRRELEVANT EVIDENCE INADMISSIBLE.

"All relevant evidence is admissible, except as otherwise provided by statute or by these rules or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible."

**8.** D.R.E. 403 provides:

"RULE 403. EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION OR WASTE OF TIME.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

We hold, therefore, that the remarks of counsel here under consideration constituted error. Defense counsel, however, chose neither to request curative instructions following the remarks, nor to rebut them in their summations. The issue thus becomes whether the error was so prejudicial and flagrant that it was incurable and required a mistrial. *See Aleardi v. Tiberi,* Del.Supr., 269 A.2d 404, 405 (1970); *Chavin v. Cope,* Del.Supr., 243 A.2d 694, 697 (1968). The question was one for the sound discretion of the Trial Court.

We are convinced that, in the context of counsel's entire arguments herein, the error was not so flagrant and unfairly prejudicial as to require a mistrial since the record does not reveal "a studied purpose" on the part of counsel to inflame or prejudice the jury improperly. *Buschlen v. Ford Motor Co.,* 107 Mich.App. 340, 310 N.W.2d 8, 12 (1981), *vacated on other gds.,* 414 Mich. 872, 322 N.W.2d 710 (1982). We hasten to add, however, that in another case, and on another record, remarks such as those specified herein could so infect a trial as to amount to reversible error. Counsel must be on guard against them, and Trial Courts must be alert to cure them, if possible, by appropriate jury instructions.

The defendants contend that the cumulative effect of these remarks of plaintiffs' counsel and the other errors alleged herein were unfairly prejudicial and require reversal. In view of our disposition of the other claims of error presented, this position is untenable.

\* \* \*

There is no reversible error upon any ground of this appeal.

Affirmed.