BEEBE MEDICAL CENTER, INC. and Lewes Convalescent Center, Inc., Defendants Below, Appellants,

v.

Anthony W. BAILEY, individually, and as Administratrix of the Estate of Julie H. Bailey, Christopher B. Connaway, Shawn M. Connaway, Elberon T. Connaway, III, Plaintiffs Below, Appellees.

No. 454, 2005.

Supreme Court of Delaware.

Submitted: Sept. 6, 2006.
Decided: Nov. 8, 2006.
Amended: Nov. 15, 2006.

---

John A. Elzufon and Andrea C. Rodgers, Elzufon Austin Reardon Tarlov & Mondell, P.A., Wilmington, DE; Mark Alan Aronchick (argued), pro hac vice, for appellants.

Chase T. Brockstedt, Murphy Spadaro & Landon, Wilmington, DE; A.L. Butler Daniel (argued) pro hac vice, for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice:

In this medical malpractice action, the defendants-appellants, Beebe Medical Center, Inc. and Lewes Convalescent Center, Inc.[1] appeal a 13 million dollar verdict for the plaintiffs-appellees, Anthony Bailey, individually, and as the Administratrix of Julie Bailey's estate, Christopher B. Bailey, Shawn M. Connaway, and Elberon T. Connaway.[2] While in Beebe's care, Julie Bailey was locked in a freezer for over four hours, suffered from frostbite, and died a few weeks later. Because Beebe conceded that Julie Bailey's injuries and death resulted from their negligence, the trial focused solely on damages. Bailey's estate brought claims for pain and suffering and punitive damages. The surviving family members individually sought damages under Delaware's Wrongful Death Statute. Before trial, Beebe moved to have the damage claims trifurcated to prevent jury confusion resulting from hearing different kinds of damage evidence on each claim in the same hearing. The trial judge denied the motion. After trial began and the jury heard substantial evidence about damages, the parties settled the punitive damage claim, and the trial continued on the remaining damage claims.

Beebe argues on appeal that the trial judge abused his discretion when he denied their motion to try the claims separately merely because of the inefficiency that would result from doing so and further claims that he ignored the unfair prejudice to Beebe that resulted. We find that the trial judge correctly considered and applied all relevant factors under Superior Court Civil Rule 42 before denying Beebe's motion to trifurcate. Although he denied the motion, the trial judge did offer to consider a limiting instruction designed to assure that the jury considered only evidence relevant to each separate category of damage claim in order to avoid or minimize any potential prejudice to Beebe. We conclude that the trial judge did not abuse his discretion by denying Beebe's motion to trifurcate.

Beebe also argues that the trial judge erred by permitting the surviving family members to recover damages for emotional distress they suffered as a result of Beebe's negligent treatment of Julie Bailey. Beebe argues that the scope of damages for mental anguish permitted under the Delaware Wrongful Death Statute and the common law precludes a recovery for the survivors' emotional distress. Beebe contends that allowing the jury to consider evidence of the survivors' emotional distress under the rubric of "mental anguish" after the punitive damage claims had been settled, unfairly prejudiced them. After reviewing the record, we find that Beebe waived this argument. Beebe's counsel

1. Beebe Medical Center and Lewes Convalescent Center, Inc. are both appellants-defendants below in this action. We refer to the appellants-defendants collectively as Beebe.

2. The appellees-plaintiffs are Julie Bailey's surviving family members, including her husband and three sons, and Julie Bailey's estate. We refer to the family collectively as surviving family members, and sometimes refer to the plaintiffs collectively as "Bailey.".

made sound, understandable tactical decisions that allowed the jury to hear evidence relating to punitive damages. Beebe's counsel did not submit detailed limiting instructions that may have aided the jury to compartmentalize evidence of emotional distress from the evidence of punitive damages. Beebe's counsel had several opportunities to object to overlapping damage evidence during the trial or to request limiting instructions, yet did not do so.

Lastly, Beebe further contends that the trial judge improperly instructed the jury because the instruction "invited the jury to base its wrongful death award on the punitive damages evidence." Beebe argues that this constituted plain error. After reviewing the instructions, we find that they were adequate. The trial judge repeatedly told the jury that they would no longer be considering the punitive damages claim. The trial judge also gave limiting instructions, albeit general in nature, regarding certain documents and testimony that could arguably be construed as evidence of emotional distress overlapping the evidence relevant to punitive damages. We conclude that the trial judge's instructions were sufficient, and did not constitute plain error. Accordingly, the Superior Court's judgments are affirmed.

### FACTS AND PROCEDURAL HISTORY

Julie Bailey was a sixty-year-old woman who suffered from Alzheimer's disease. Because of her disease, she functioned at the intellectual level of a two-year-old. On December 25, 2002, she suffered from stomach problems, and went to Beebe for treatment. On December 28, 2002, Beebe transferred her to LCC, a nursing care facility that Beebe owns. Julie Bailey arrived at approximately 11:00 a.m. and approximately four to five hours later, LCC's staff discovered that she was missing from her room. After searching the facility and surrounding areas for approximately four and a half hours, LCC staff found Julie Bailey locked in a freezer room in the kitchen. Julie Bailey was frozen to the floor of the freezer by her own urine. She suffered severe injuries as a result of this incident, including frostbite to her hands, feet, and nose. Julie Bailey obtained treatment for her injuries at Beebe; however, Beebe staff did not provide her with pain medication before administering frostbite treatments. That failure prolonged Julie Bailey's suffering. On January 21, 2003, Julie Bailey suffered a pulmonary embolism, and died a short time later.

On April 11, 2003, Bailey's estate and surviving family members filed an action against Beebe. Julie Bailey's estate asserted claims for pain and suffering and punitive damages related to Beebe's negligent treatment of her. Her surviving family members individually sought damages under Delaware's Wrongful Death Statute.[3] In a pretrial motion *in limine,* Beebe moved to have the trial trifurcated to separate: (1) the Estate's claim, (2) the wrongful death claims; and, (3) the punitive damages claim. The trial judge denied Beebe's motion to try these claims separately.

The Superior Court held a jury trial from March 9, 2005 through March 16, 2005. During Bailey's case, Bailey submitted evidence of both punitive and compensatory damages. The parties settled the punitive damages claim on March 15, 2005. The parties met with the trial judge on March 15 and 16, 2005 to discuss various trial issues, including jury instructions and the exclusion of evidence relating to punitive damages. On March 16, 2005, Bailey

---

3. 10 *Del. C.* § 3724.

called their final witness and rested their case. The trial judge then told the jury that the punitive damages claim was no longer an issue in the case, and Beebe stated that they were not calling any witnesses because the punitive damages claim was no longer an issue. The trial judge then instructed the jury. The jury returned a verdict for compensatory damages in the amount of $4,000,000 to Julie Bailey's estate, $3,000,000 to her husband, Anthony Bailey, and $2,000,000 to each of her three sons, for a total of $13,000,000. Beebe filed a motion for a new trial or remittitur. The trial judge denied the motion, and Beebe appealed.

### DISCUSSION

**1. The trial judge did not abuse his discretion by denying Beebe's motion for separate trials.**

■ Beebe argues that the trial judge abused his discretion by denying their motion to "trifurcate" or hold separate trials on the damages claims; and, as a result, unfairly prejudiced Beebe. Beebe contends that the "Superior Court [in denying the motion to trifurcate] ignored the potential prejudice to the Defendants from a consolidated trial and . . . focused solely on the potential for overlapping witnesses and concerns for efficiency."

■ We review a decision denying a motion to try claims separately for abuse of discretion.[4] This Court will not reverse

the trial judge's determination unless one of the parties has been unfairly prejudiced.[5]

Delaware Superior Court Civil Rule 42(b) states:

The Court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claims, counterclaim or third-party claim, or of any separate issue or of any number of claims, cross-claim, counterclaim, or third-party claims or issues.[6]

In the past, trial judges have decided whether or not to try claims separately by considering the witnesses that would need to testify and the evidence that would be presented at trial. For example, in *Union Mutual Life Insurance, Co. v. Dewey*, the trial judge denied a motion to separate claims because it was likely that the same witnesses would be needed to testify on both claims and the documents introduced would be the same for both.[7] The trial judge held that "[s]eparation of the cases for trial would require duplication, double expense and would not be conducive to the expedition of the trial and economy."[8] On a motion for separate trials on liability and damages in a negligence case, the Superior Court also has declined to separate the issues for trial where the same witnesses would have to testify at length on both the

4. *McNally v. Eckman*, 466 A.2d 363, 367 (Del. 1983) (The issue presented against one of two tortfeasors included willful or wanton conduct and against the other ordinary negligence. This Court affirmed the trial judge's decision to grant the motion to separate the claims because he did not abuse his discretion and there was no unfair prejudice to the complaining party).

5. *Id.*

6. Del.Super. Ct. Civ. R. 42(b).

7. *Union Mutual Life Insurance, Co. v. Dewey*, 270 A.2d 833 (Del.Super.Ct.1970) (Insurer brought a declaratory judgment against corporation and employee. The defendants filed a cross claim against another for negligent misrepresentation. The Superior Court judge denied the motion to separate the claims).

8. *Id.* at 834.

issue of liability and damages.[9] The trial judge also reasoned that "motion[s] for separate trials of liability and damages in negligence suits should be carefully considered and sparingly granted."[10] The trial judge explained that separation may be beneficial in multiparty litigation where many plaintiffs are joined and an issue of liability is common to all of them but damages differ for each party.[11] Other situations that may warrant separation are cases containing diverse claims, such as permissive counterclaims, which are unrelated to the principal cause of action.[12]

In their motion for trifurcation, Beebe contended that the jury's anticipated anger in response to the punitive damages evidence would potentially inflate any compensatory damages award "based on passion and prejudice that bears no relationship to the actual damages suffered by the plaintiffs." Beebe purported to support their position by arguing that the evidence that would establish compensatory damages was totally independent of the evidence that would ultimately be used to establish punitive damages. Beebe conceded in their motion, however, that "evidence of the impact of some of the alleged conduct which forms the punitive damage claim may be relevant to the plaintiffs' individual mental anguish claims under the Wrongful Death Statute."

In response, Bailey's estate and surviving family members argued that separating the claims for trial was not feasible because evidence of both the compensatory damages and punitive damages claims would be intertwined and could not be neatly divided. In addition, trifurcation would be inefficient and counter to the interest of judicial economy. Lastly, Bailey's estate and surviving family members urged that it would be an emotional hardship for Julie Bailey's family to have to testify multiple times.

In deciding to deny the motion to try the damages claims separately, the trial judge considered several factors enumerated in Delaware Superior Court Civil Rule 42, including convenience, avoidance of prejudice, and judicial economy.[13] The trial judge considered the evidence that would be presented at trial, the potential prejudice to Beebe, and the risk of inefficiency. The trial judge reasoned that the evidence could not be "neatly segregated and presented in a manner consistent with the defendants' request for trifurcation." The trial judge stated, "I simply see no practical way for the witnesses to divide up their testimony to fit into the defendant's request ... [T]he evidence in this case on both compensatory and punitive damages is so interwoven that much of it would have to be repeated again in different phases of the trial." The trial judge also pointed out that Beebe acknowledged the overlap of punitive and compensatory damages evidence in their own motion, and that he (the trial judge) was reluctant to require Julie Bailey's family members to testify multiple times, which he suspected would be very difficult for them. It would also be difficult and expensive to have expert witnesses testify multiple times.

---

9. *Randolph v. Scott,* 338 A.2d 135 (Del.Super.Ct.1975) (Bicyclist brought an action against an operator of a motor vehicle for injuries in an accident. The defendant moved for separate trials on the issues of liability and damages, and the Superior Court judge denied the motion).

10. *Id.* at 136.

11. *Id* at 137.

12. *Id.*

13. *See* Del.Super. Ct. Civ. R. 42(b).

As the trial judge stated, "I think trifurcation of this particular case would turn this trial into a much larger, inefficient, and more difficult case to manage for the Court and for the parties and for all the participants." The trial judge did, however, state his willingness to consider any jury instructions that would clarify what evidence the jury may consider and for what purpose it may be considered.[14] His offer to consider limiting instructions for the jury specifically demonstrates that the trial judge completely appreciated Beebe's concerns and offered a solution designed to minimize any prejudice while maximizing the efficient management of the trial.

The record does not demonstrate that the denial of the motion to separate the damages claims for trial prejudiced Beebe. The trial judge reviewed the jury's award after the trial, found that the evidence overwhelmingly supported the award and did not support the supposition that the jury was motivated by anger towards Beebe. Those findings are not clearly erroneous. Accordingly, we hold that the trial judge did not abuse his discretion by denying Beebe's motion to hold separate trials on the damages claims.

## 2. Beebe waived their argument that the trial judge erred by not narrowing the scope of mental anguish for the compensatory damage claims.

Beebe next argues that the trial judge erred by permitting Julie Bailey's family members to recover for emotional distress they suffered as a result of Beebe's negligent treatment of Julie Bailey. They maintain damages for emotional distress are not recoverable either under Delaware common law or Delaware's Wrongful Death Statute. Beebe contends that the scope of potential recovery for mental anguish under Delaware's Wrongful Death Statute [15] is limited, and that by allowing the jury to consider the survivors' emotional distress, the trial judge erroneously permitted the jury to base its wrongful death award on punitive damages evidence, instead of the more narrow evidence of mental anguish. As a result, Beebe maintains, the jury improperly inflated their compensatory damages award.

"Delaware Rule of Evidence 103 [16] requires a party to raise a contemporaneous objection to evidence presented during trial or risk losing the right to raise that issue on appeal." [17] A waiver occurs where a party fails to object or raise that issue on appeal, unless the error is plain.[18]

---

14. The trial court:

> While I have not granted the defendants' motion, I am certainly more than willing to consider any tailored jury instructions that will make it clear to the jury what evidence they may consider and what purposes they may consider that evidence for when they are considering this case and when they go to conduct their deliberations. Many times in many other cases, we will admit evidence for a limited purpose, and we will often tell the jury that they may only consider it for that particular purpose and they may not consider it for any other purpose.
>
> So with that in mind, I am certainly willing, as much as possible, to focus on those concerns raised by the defendants and to make sure that the jury only considers things properly and for the proper pur-

poses, and if there are any special jury instructions that the defendants would like to propose that would make it even clearer to the jury, I will certainly entertain those because I do think the defendants' concerns are legitimate in this case.

> I don't want to bleed over punitive damages to compensatory damages.

15. 10 *Del. C.* § 3724.

16. D.R.E 103.

17. *Hackett v. State*, 888 A.2d 1143, 1145 (Del. 2005).

18. *Id.*, (citing *Capano v. State*, 781 A.2d 556, 653 (Del.2001); *Goddard v. State*, 382 A.2d 238 (Del.1977)); *see also* D.R.E. 103(d).

Therefore, where a party advances an argument on appeal, we must determine whether that argument precludes waiver. If we conclude that the party has waived its argument for purposes of appeal, the argument can survive only if plain error occurred in the court of first instance.

We have reviewed the record to determine whether Beebe have waived their argument on appeal. Beebe's counsel represented both Beebe and LCC on both the compensatory and punitive damages claims. That required Beebe's counsel to make several strategic decisions regarding representation, because his clients had potentially conflicting interests. We reasonably can infer from the record that any insurance carrier would be, in part, responsible for compensatory damages, and that Beebe and LCC would be individually responsible to pay any punitive damages awarded. At the beginning of the trial, when both punitive and compensatory damages were at issue (and BMC, LCC, and their probable insurance carriers were all involved in the case), Beebe's counsel did not raise any argument concerning the scope of a claim for mental anguish under the Delaware Wrongful Death Statute.[19] Indeed, Beebe's opening argument is inconsistent with their present argument on appeal regarding the scope of a claim for mental anguish:

> So what are punitive damages? And the best way to discuss punitive damages is to compare it with compensatory damages. Remember, compensatory damages is a given in this case. So what is compensatory damages for? The top part is a given. The goal: Just and full compensation for the losses of the plaintiffs. That's what you're definitely going to do in this case. Negligence goes to compensatory damages. Pecuniary is actually negligence. That's part of the compensation, a given part of the case.
>
> . . . .
>
> . . . You may say to yourself, the warning signs were there. Why didn't they do something about it? That's a conclusion that you can reach from the evidence. And if you consider and you conclude from that evidence that they just didn't get it, that they made some wrong decisions that were unreasonable reactions, I'm saying that's the case. But you may conclude that that goes to compensatory damages, not punitives. Not because I say so, but because the Delaware Supreme Court says that's the standard.

We infer that a reasonable tactic for Beebe—consistent with its self-interest—would have been to urge the jury to consider the broadest possible scope of the evidence for the inevitable compensatory damages award so that the award would be covered by any available insurance.

Thus, Beebe did not object to the introduction of broadly cast evidence of damages during trial, nor did Beebe request limiting instructions during the testimony of Bailey's witnesses or at the trial's conclusion. Tony Bailey, Julie Bailey's husband, testified about Julie's battle with Alzheimer's disease, about what happened on the evening she was locked in the freezer, and how the details he later learned regarding the deficiencies at LCC affected his grieving.[20] Beebe's counsel did not

---

19. *10 Del. C.* § 3724.

20. Q: (Bailey's counsel): Tony, I need you to explain to the jury how all of this affected you.

 A: (Tony Bailey): Well, it's been extremely difficult to go forward. Because as time has gone on, I was doing ok for a while. But then more details started to come out. It's just like reliving it.

object, nor did he request limiting instructions suggesting that the jury should only be permitted to use that testimony for a particular purpose. Julie Bailey's sons also testified about how they were affected after learning of the problems with LCC and Beebe.[21] Again, Beebe did not object during their testimony, nor did they ask the trial judge to give instructions limiting the scope of the evidence of emotional distress the jury could consider in determining the appropriate compensation for the surviving family members' mental anguish. Although Beebe neither objected

to this evidence as it was admitted nor requested limiting instructions, they now assert that the trial judge improperly allowed the jury to consider the evidence.

■ Beebe did not preserve that argument for appeal simply by asking that the plaintiffs' damages claims be trifurcated.[22] Only after the parties had settled the punitive damages claim did Beebe, for the first time, raise concerns that the overbroad scope of the evidence of mental anguish created the risk of an inappropriately large compensatory damage award.[23] While we

> Q: What details? What details are you talking about?
> A: The screw-ups. And particularly about LCC. I didn't have—I had felt that with all of this, I had felt still that I let Julie down. LCC, in reading some of the depositions, the staff there were [sic] very apprehensive about dementia patients. And quite frankly, they were not competent to—they were not up to handling Alzheimer's or dementia patients, in my opinion.
> Q: Okay. And how has learning about that incompetence affected your ability to grieve and to move on?
> A: I can't move on. I spent two years. It's been two years and two months now, and there are days that I couldn't even get off the couch, have no ambition. I haven't done any glass working at all. I'm doing these, like I said, reproductions a lot, making a few dollars there. But it's just a nightmare. But when I found out the apprehension, if that's the right word in this case, of LCC to take care of dementia patients, but then to find out that you will take them, that was outrageous.

21. Chris Connaway, Julie Bailey's son made the following statements during his direct examination:

> Q: I understand. During the course of this process that you have been through, you have seen the evidence in this case, obviously, and you have become aware of some of the warnings and some of the other problems that existed at the LCC. You have become aware of the complaints to the management about taking

> these types of patients, like your mother, and evidence that this may have—that this was preventable [sic]. And I want you to tell the jury that now knowing that this could have and should never have happened, how that has affected your ability to deal with this like someone would a normal death?
> A: This—I guess we could all make the same assumptions [Beebe's counsel] has and assume that LCC was just a great place to be, but it just flat out wasn't. They had so many flags. They knew about the daggone problems. They knew it.. Where they knew things was from an administrative level, and if you don't give your employees the proper tools to work with, how are they supposed to make things better . . .
> It makes this so much harder to be able to deal with and get over this when you know it was a—it was such a loaded gun waiting to happen. This was foreseeable. This was unavoidable. It should not have happened, and above all, my mother was the most—to me, most undeserving person to have anything like this ever to happen. She—nobody—not just my mom, nobody should have to look at their mom in a way that we had to do. And still do. It's just not right.

22. See *Hickman v. State*, 801 A.2d 10 (Del. 2002); *Hackett v. State*, 888 A.2d 1143, 1145 (Del.2005); *MacDonald v. State*, 816 A.2d 750, 756 (Del.2003).

23. Beebe's counsel's remarks are most telling in regard to Beebe's tactical dilemma:

can appreciate Beebe's concern, Beebe expressed that concern too late in the trial.

The trial judge repeatedly attempted to solicit Beebe's suggestions for limiting instructions so that the jury would know specifically what evidence they could and could not consider when contemplating compensatory damages. In a March 15, 2005 conference, the trial judge suggested that it may be beneficial for Beebe to refer specifically to certain pieces of evidence for the judge's limiting instructions. Instead, Beebe advised that counsel would use his closing to help clarify issues for the jury, stating: "[a]s I see it, what it may come down to is general instructions to the jury, and then it may come down to what I say on rebuttal."

Beebe also acknowledged that it was their burden to prepare a request for jury instructions and present it to opposing counsel and the trial judge for approval.[24] On March 16, 2005, the trial judge reminded Beebe:

> But I said I'm certainly amenable to any kind of limiting instruction, taking a look at it. And you [Beebe] said you [Beebe] would take the heavy load and go back, and it would be your [Beebe's] burden, to some degree of specificity, to say these were the things, ladies and gentlemen [of the jury], that you should not pay any attention to. And you [Beebe] have in your instruction mentioned some things, but that's kind of where we are.

I have been instructed by the [insurance] carrier to raise the issue that the jury has seen a lot of evidence, for lack of a better term, about what a bad place LCC was, and that is not an issue here. The carrier asked me, "Well, do you think that could be presented as an issue before the court?" I said—[sic] I don't mind belying confidences. They know I have to tell the Judge—"If I were [Bailey's counsel], I

The trial judge clarified that he had decided to exclude certain documents containing flat numbers regarding Beebe's net worth because they were relevant only to the punitive damages claim, which was no longer part of the trial. The trial judge reiterated, however, that much of the evidence in the trial regarding compensatory and punitive damages overlapped, and that Beebe conceded this fact in their pretrial motion for trifurcation. The following discussion then took place:

The trial judge:

> You know, I guess your point is you agree with me [about the overlap of evidence for compensatory and punitive damages], but that it is unfairly prejudicial. I simply do not think that it is unfairly prejudicial.
>
> I am willing to sit here and go document by document to make sure that we do not let in something that had we taken the time to look at it, I might have kept it out. I think we talked about money in a general sense yesterday. [Bailey's estate and surviving family members' counsel] said, I'm not going there, I'm not going to get up there and say Beebe was rich with a net worth of 88 million dollars or whatever it was, and therefore, that's something you folks ought to think about.
>
> The relevancy is that Beebe, regardless of how much money it had . . . had some money to do some things and didn't do it. That is to me a little more relevant. The dollars are not.

would say that that is a part of the emotional claim of the plaintiffs because they wouldn't be in that position except for their improper care."

**24.** "Like I say, the burden is on the defense to work together and get it to everybody so that we can come back tomorrow morning and knock out those two instructions . . ."

Bailey's estate and surviving family members' counsel:

> I just want to bring up one thing for the record on this taking the time to go through the documents ...
>
> But when we had your motions to exclude some of the evidence, Your Honor indicated on the record, and I'm sure that the transcript will bear this out, that you had been put in a difficult position because there are so many surveys and no one has taken out which ones are objectionable, which ones there are objections to, and which ones there would be objections to on relevance to the punitive which is one of the objections for compensatory. And you made that statement and you said I would like to have a specific objection to which of those there is a specific objection to. But your general ruling is that they come in, absent a specific objection. Now, that's what you said.
>
> And at no time was there ever any objection raised to any specific survey for any purpose. And so, Judge, to now say let's go through and start climbing through them and start figuring out which ones are objectionable, Judge, it would be the plaintiffs' position that any objections were waived because they were never brought. They were never raised. They were waived and I think the record is going to bear that out clearly.

Beebe's counsel:

> We did object to all records, all HSS surveys that postdated the Julie Bailey incident and the fact the jury hasn't seen them. So that's not an issue. I am not applying for a document-by-document review. Because the facts remains

[sic], given the Court's ruling, and my objection is noted. I think that the only documents we have to be concerned with are the ones that mention specific numbers. And only one or two, that 32–million–dollar Merrill–Lynch document, maybe the one with the MRI, maybe the 500,000 at LCC. None of the HSS reports fall under that issue. None of the incident reports fall into that issue.

The trial judge then further explained his ruling as follows:

> I know how these things are examined six months from now, a year from now. Little things will be picked to pieces. Long briefs will be written on a document or two documents or three documents.
>
> In my world, it is never too late to fix a problem. The opportunity is there, and it is not always that I am just a nice guy giving you a chance. I am always thinking ahead about how this is going to look when the Supreme Court say, well, Judge [name omitted], what were you thinking; you're talking about generalities, you didn't even have that document before you.
>
> And the other side will say, well, Judge [name omitted] did give the parties a chance to bring it forward, they elected not to, they waived it.
>
> So it is not always that unpleasant, it's that, I'm thinking about the quality of my rulings as well. So that why I do what I do.

Beebe responded that they would not be prejudiced if they declined an opportunity for a document-by-document review to determine whether any documents should be excluded or explained in a limiting instruction.[25] Later in the conference, the trial

---

**25.** Beebe: "And for the record, in case someone is reviewing this, I do not feel we've been prejudiced by the fact that at this date we haven't had the opportunity to go document

judge told Beebe that there was some confusing language in Beebe's request for a limiting instruction. Beebe's counsel responded, "I have to confess that I wrote this instruction with the hopes that my motion [for] reconsideration would be granted." The trial judge again told Beebe that he was looking to Beebe "to focus on the evidence that you [Beebe] clearly think is excluded by those rulings, because we are talking in generalities to some extent."

■ The trial judge gave Beebe ample opportunity to request detailed limiting instructions for the jury. It was Beebe's responsibility, as Beebe conceded, to request limiting instructions from the trial judge that would fully inform the jury and protect Beebe's interests. The trial judge offered to examine each piece of evidence to determine what should be addressed in the limiting instructions or excluded from the jury deliberation room, but Beebe refused that option. Apparently Beebe did not want the jury to hear more specific damages instructions; therefore, Beebe waived any claim that the trial judge erred by not independently crafting and giving his own limiting instructions. Beebe's remarks during their opening statement, their failure to object during Bailey's witnesses' testimony on mental anguish, their failure to request limiting instructions at the time of that testimony, and their failure to request specifically detailed damage instructions at the trial's conclusion, amount to waiver of their present argument on appeal regarding the scope of mental anguish under Delaware's Wrongful Death Statute.

We are mindful of Beebe's predicament and the difficult tactical decisions that Beebe's counsel had to make both at the start of trial and after the parties settled the punitive damages claims. We do not in any way suggest that the decisions made were anything other than carefully considered. In the end, however, Beebe chose to try the case the way they did, and as a result, waived any opportunity to contest the scope of mental anguish under Delaware's Wrongful Death Statute on this appeal.

3. **The trial judge's jury instructions were sufficient; therefore, plain error did not occur.**

Lastly, Beebe contends that even if they waived their argument based on the narrow scope of mental anguish damages on appeal, reversal is still required because the trial judge "invited the jury to base its wrongful death award on the punitive damages evidence," which constituted plain error. Although Beebe waived their underlying argument on appeal, we must also address Beebe's plain error argument.

■ Supreme Court Rule 8 provides that "[o]nly questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, [this] Court may consider and determine any question not so presented." [26] "Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." [27] "[T]he doctrine of plain error is limited to material defects which are apparent on the

by document. It's only those documents that refer to numbers that I feel are in the Court's rulings, and without waiving the objection, once the Court has made its rulings, the rest of it flows from that. But I do appreciate the opportunity."

26. Del. Supreme Ct. R. 8.

27. *Wainwright v. State*, 504 A.2d 1096, 1100 (Del.1986) (citing *Dutton v. State*, 452 A.2d 127, 146 (Del.1982)).

face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[28] "While some inaccuracies and inaptness in statements are to be expected in any [jury] charge, this court will reverse if the alleged deficiency in the jury instructions undermined the jury's ability to intelligently perform its duty in returning a verdict."[29] "Therefore, we must determine whether the instructions to the [ ] jury were erroneous as a matter of law, and, if so, whether those errors so affected [the parties'] substantial rights that the failure to object to the instruction at trial is excused."[30]

 Although the trial judge has the responsibility to instruct the jury; it is the parties' responsibility to bring to the trial judge's attention the instructions they consider appropriate and the reasons why.[31] "A trial [judge's] charge to the jury will not serve as grounds for reversible error if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.' "[32] We look at the jury instructions as a whole to make this evaluation.[33]

 Although Beebe failed to supply the trial judge with specific limiting instructions on damages for mental anguish and although Beebe declined the trial judge's offer to conduct a document-by-document review of the evidence in preparation for crafting limiting instructions, the trial judge's instructions, nevertheless, en-

abled the jury to make a well informed decision and award appropriate damages. Beebe argues that jury inflated the compensatory damages award because the jurors were angered by the punitive damages evidence and, as a result, improperly considered and weighed that punitive damages evidence when considering the compensatory damages award. Our review of the instructions, however, reveals that the trial judge told the jury three separate times that the punitive damage claim was no longer an issue in the case and should no longer be considered. He further instructed the jurors that they must not be influenced by prejudice, sympathy, anger, hostility, or any similar motive when making their decision. The trial judge's instructions also explained that the jury should consider certain types of evidence in a limited way because there was no longer a punitive damage claim:

> Since the punitive damage claim is no longer an issue, how should you consider this evidence and these documents?
>
> They should only be considered by you in your evaluation of the plaintiffs' mental anguish claim. Let me explain that a little further.
>
> There has been testimony from the plaintiffs that part of their mental anguish claim is the knowledge they now have of the conditions at the Lewes Convalescent Center. These documents and this testimony are relevant on plaintiffs' claims that their mental anguish claims have been worsened. They are not relevant for any other purpose.

---

28. *Id.*

29. *Riggins v. Mauriello,* 603 A.2d 827, 830 (Del.1992) (citing *Probst v. State,* 547 A.2d 114, 119 (Del.1988)).

30. *Probst v. State,* 547 A.2d 114, 119 (Del. 1988).

31. *Bullock v. State,* 775 A.2d 1043, 1047 (Del. 2001) (citing *United States v. Cooper,* 812 F.2d 1283, 1286 (10th Cir.1987)).

32. *Probst* at 119 (quoting *Flamer v. State,* 490 A.2d 104, 128 (Del.1984)).

33. *See Flamer v. State,* 490 A.2d 104, 128 (Del.1984).

Last week you heard evidence about Beebe Medical Center's net worth and how much money it had in the bank. These figures only had relevance to the punitive damages claim. You are not to consider these figures in deciding the amount of compensatory damages to award to the plaintiffs. You should put those figures out of your mind. For the purpose of your deliberations now, it is as if those figures were never mentioned to you.

I remind you again to avoid being swayed by any emotion of anger or hostility toward the defendants as you consider the evidence, this evidence, in the limited fashion that you may.

Beebe requested that the trial judge also give a limiting instruction regarding the notes that they took at trial, and the trial judge did so.[34] Finally, the trial judge instructed the jury in accordance with the Superior Court's Pattern Jury Instruction as follows:

Delaware law provides that when a person dies as a result of another's wrongful act, certain family members may recover fair compensation for their losses resulting from the death. In determining a fair compensation, you may consider the mental anguish suffered by Anthony Bailey, Chris Connaway, Shawn Connaway, and Elberon Connaway, as a result of Julie Bailey's death.

The term mental anguish encompasses the grieving process associated with the loss of a loved one. You may consider the grieving process, accompanied by its physical and emotional upheaval, will be experienced differently by different people, both in its intensity and in its duration. The ability to cope with the loss may be different for each person.

There is no fixed standard or measurement. You must determine a fair and adequate award through the exercise of your judgment and experience after considering all the facts and circumstances presented to you during the trial.

While the surviving family members carry the burden of proving their damages by a preponderance of the evidence, they are not required to claim and prove with mathematical precision exact sums of money representing their damages for mental anguish. It is required only that they furnish enough evidence so that you, the jury, can make a reasonable determination of those damages.

In considering the jury instructions as a whole, and acknowledging that all parties agree that inevitable overlap occurred in the damages evidence, we find that the instructions satisfy the "reasonably informative and not misleading" standard. The jury was intelligently able to perform its duty in returning a verdict based on instructions that we conclude were legally adequate under the circumstances. Therefore, we hold that the trial judge's jury instructions were proper, and did not constitute plain error.

---

**34.** Trial judge:

One of the instructions I gave to you is what is known as a limiting instruction, and that is called that because it limits the manner in which you may consider certain evidence . . .

In the instructions I said, that it was a lot of evidence that was submitted on the punitive damages claim. That claim is no longer before you, but that you could still consider some of that evidence or consider that evidence for a certain purpose, and that was whether or not the plaintiffs' mental anguish claims were worsened by certain things that they learned.

That is the limiting instruction. When you are looking at your notes, if you look at your notes during your deliberations, you should also apply that limited instruction to anything that you have in your jury notes.

For the foregoing reasons, the judgments of the Superior Court are AFFIRMED.